Vince M. Verde, CA Bar No. 202472
vince.verde@ogletree.com
Thomas B. Song, CA Bar No. 271907
thomas.song@ogletree.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
Park Tower, Suite 1500
695 Town Center Drive
Costa Mesa, CA 92626
Telephone: 714.800.7900
Facsimile: 714.754.1298

Attorneys for Defendant
JACOBS ENGINEERING GROUP INC.
(erroneously sued as Jacobs Engineering Group)

Carney R. Shegerian, Esq., State Bar No. 150461
CShegerian@Shegerianlaw.com
SHEGERIAN & ASSOCIATES, INC.
225 Santa Monica Boulevard, Suite 700
Santa Monica, California 90401
Telephone Number: (310) 860-0770
Facsimile Number: (310) 860-0771

Attorneys for Plaintiff,
MARK J. CONCIALDI

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| MARK J. CONCIALDI<br><br>Plaintiff,<br><br>v.<br><br>JACOBS ENGINEERING GROUP, EDD PAGANO, and DOES 1-100, inclusive,<br><br>Defendants. | Case No. 2:17-cv-01068 FMO (GJSx)<br><br>**JOINT BRIEF RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Hearing Date: January 18, 2018<br>Time: 10:00 a.m.<br>Courtroom: 6D<br>Before the Honorable Fernando M. Olguin<br><br>Complaint Filed: December 9, 2016<br>Trial Date: March 20, 2018 |

# **TABLE OF CONTENTS**

**Page(s)**

I.   INTRODUCTIONS ................................................................................. 1

    A.   Jacobs' Introduction ................................................................ 1

    B.   Concialdi's Introduction ......................................................... 1

II.   STATEMENT OF FACTS .................................................................... 3

  DEFENDANT'S STATEMENT OF FACTS ................................................ 3

    A.   Plaintiff was an at-will employee while employed by Jacobs. ............... 3

    B.   Plaintiff's Job Duties. ............................................................. 4

    C.   Concialdi's Poor Job Performance is Rated at an Overall "2" out of 5 for his 2015 Performance Review – Lowest Among the Auditors. ............................................................................... 4

        1.   Concialdi's Audit Reports Are Poorly Drafted and Require Multiple Revisions Before Sending to the Board of Directors. ...................................................................... 5

        2.   Concialdi is Evaluated as the Lowest Performing Auditor. .......... 8

    D.   The decision is made to add an internal auditor based in Europe; Concialdi's position is selected for elimination based on being the lowest performing auditor. ............................................. 9

    E.   Concialdi Admits that he Informed Pagano of his MS only After Being Told His Job was Being Eliminated. ............................. 11

    F.   Pagano only saw Concialdi walking with a limp on two or three occasions in 2015. ................................................................. 11

    G.   Concialdi Never Submitted Any Complaint Regarding Pagano. ......... 13

  PLAINTIFF'S STATEMENT OF FACTS .............................................. 14

    A.   Concialdi's History of Excellent Performance. ...................... 14

        1.   Concialdi's Managers Speak Highly of His Ability and Work. ......................................................................... 14

    B.   In 2009, Concialdi Is Diagnosed with Multiple Sclerosis and Informs Management, Human Resources, and His Co-Workers of the Diagnosis. ................................................................... 15

        1.   Concialdi Informs Manger Gus Hubert of His MS Diagnosis in 2009. ....................................................... 15

        2.   Concialdi Informs Krishna Nunnelly in Human Resources of His MS by Early 2010. ................................. 15

1

3.    Concialdi Informs His Co-Workers Peggy Burns and Louise Evered of His Condition. .............................. 16

4.    Concialdi Suffers a Relapse of His MS in 2012, and by 2013 His Right Leg Becomes Numb, and He Begins Walking Very Slowly and with a Noticeable Limp. ............ 16

5.    After His Relapse in 2012, Concialdi Informs Plante that He Has MS ............................................................ 17

C.    Before Hiring Pagano, Kevin Berryman Informs Him that He Needs to Bring Up the "Integrity" of the Department. ................. 17

D.    Pagano Takes Over as Vice President of Internal Audit in July of 2015 and Immediately Begins to Harass Concialdi. ................. 17

E.    Concialdi Is Extremely Offended by Pagano's Remarks, and They Caused Him Anxiety ............................................. 18

F.    Pagano's Low Review Scores for Concialdi Contradict His Testimony Surrounding Concialdi's Performance. .................... 18

1.    Pagano Testifies that Concialdi's "Guilty Until Proven Innocent" Approach to Investigations Had "Nothing" to Do with His Decision to Terminate Concialdi's Employment. ....... 18

2.    Concialdi and His Co-Workers Discuss How Pagano Was Extremely Critical of Their Work, But Treated Concialdi Worse than the Others. .............................................. 19

3.    The South Africa Report Is the First Risk Assessment Audit and Report Concialdi Had Ever Done in His Career. ...... 19

4.    The Assistant for the Internal Audit Department Was in Charge of Fixing Grammatical Errors in Reports. ................ 19

G.    In November of 2015, Concialdi Replies Affirmatively to a Request from Human Resources to Disclose His Disability Status. .... 20

H.    Aside from His Informing Pagano of His Bad Leg and Disclosing His MS to Numerous Personnel at Jacobs, It Was Apparent from Watching Concialdi Walk that He Had a Disability. ................ 20

1.    Concialdi Requests Accommodations from Pagano Because of His Disability. ............................................ 20

2.    Concialdi Believes Everyone Knows He Has a Disability. ........ 21

I.    In January of 2016, Berryman Instructs Pagano to Eliminate a Current Position from the Internal Audit Department to Make Room for a Position in Europe. .................................... 21

J.    Pagano Gives Concialdi Poor Performance Review Scores and Uses Them as a Basis for Terminating Concialdi's Employment. ....... 21

2

K.  Concialdi Believes His Complaints About Pagano's Unfair Treatment Resulted in His Low Review Scores. ................... 22

L.  Pagano Contradicts His Statement that He Was the Sole Decision-Maker in Concialdi's Employment Termination and Places the Decision on Senior Management. ......................... 22

M.  At His Employment Termination Meeting, Pagano Informs Concialdi that His Employment Is Being Terminated Because There Is No Position in Pasadena. ......................... 22

N.  The Budget Increases to Allow for Two Additional Auditors After Concialdi's Employment Is Terminated. ................................. 23

O.  Pagano's Poor Management Skills. ......................... 23

P.  Pagano Fails to Follow Defendant's Progressive Discipline Policy. ......................... 23

Q.  Defendant's Failure to Follow Policy and Issue Concialdi Annual Performance Reviews. ......................... 23

R.  Defendant's Policy Is to Terminate Employment for Good Cause, and Pagano Admits that He Did Not Fire Concialdi for Cause. ........... 23

S.  Plante Is Forced to Resign After He Is Diagnosed with Cancer. ........... 24

T.  Concialdi Suffers from Ventricular Contraction, Psoriasis, Depression, Anxiety, and Loss of Sleep as a Result of the Wrongful Termination of His Employment. ......................... 24

III.  LEGAL ARGUMENT ......................... 25

A.  (D) Plaintiff's Disability Discrimination Claim Fails as a Matter of Law. ......................... 25

1.  (D) Plaintiff Cannot Establish a *Prima Facie* Case. ................... 25

a)  (D) Plaintiff Cannot Prove that Pagano Had Knowledge of his MS. ......................... 25

b)  (D) Plaintiff Cannot Establish A Causal Connection Between His Limp and Pagano's Decision. ......................... 26

2.  (D) Legitimate and Non-Discriminatory Reason for Termination. ......................... 28

3.  (D) Plaintiff Cannot Establish That Jacobs' Reason Was Pretext. ......................... 28

B.  (P) Direct and Indirect Evidence Negates Summary Adjudication. ........... 29

C.  (P) Concialdi Makes a *Prima Facie* Showing of Discrimination, Including that Defendant And Pagano *Perceived* His Disability. ......... 30

3

1.  (P) The Decision Makers' Animus Against Concialdi's Perceived Disability Supports the Disability Discrimination claim. .......................................................... 31

2.  (P) The Disputed Facts Demonstrate that Defendant and Pagano Had Knowledge of His Disability. ............................. 31

3.  (P) The Disputed Facts Demonstrate a Causal Connection Between Concialdi's Disability and Pagano's Discharge Decision. ................................................................. 32

D.  (P) A Plethora of Evidence Demonstrating Pretext Negates Summary Judgment in Its Entirety. ..................................... 33

1.  (P) Defendant's Entire Motion Rests on False Testimony, Negating Summary Judgment. ...................................... 33

2.  (P) Defendant's False Stated Reasons for Firing Concialdi Are "Unworthy of Credence" and Negate Summary Adjudication. ........................................................... 34

3.  (P) Subjective Performance Criticism Is Susceptible to Discriminatory Abuse and Can Demonstrate Pretext. ............... 34

4.  (P) Deviating from Policies and Practices for Concialdi Is Evidence of Pretext. .................................................. 34

5.  (P) A Work Culture Tolerating Bias Proves Pretext. ................. 35

6.  (P) Biased Remarks Create an Inference of Pretext. ................. 35

E.  (P) Defendants Are Liable Under the "Cat's Paw" Liability Theory. .................................................................. 35

F.  (D) Plaintiff's Age Discrimination Claim Fails as a Matter of Law. ..................................................................... 36

G.  (P) Defendant's Conduct Was Premised on Both Concialdi's Age and His Disability, Thus, the Age Discrimination Claim Must Also Survive. .......................................................... 38

H.  (D) Plaintiff's Harassment Claims (COA No. 2 & 5) Fail under the Law. .................................................................. 38

I.  (P) The Age and Disability Harassment Claims Survive Summary Adjudication. ........................................................... 39

J.  (D) Plaintiff's Retaliation Claims (COA Nos. 3 &6) Fail Under the Law. .................................................................. 40

K.  (P) Plaintiff Makes a *Prima Facie* Showing of Retaliation. ................. 41

L.  (D) Plaintiff's Failure to Provide Reasonable Accommodation and Failure to Engage in Interactive Process Claims Fail. .................. 41

M.  (P) Defendant Failed to Accommodate Concialdi. ............................... 43

4

N.    (P) Defendant's Blatant Failure to Engage in the Interactive
      Process and Instruction for Concialdi to Keep His Diagnosis to
      Himself. ................................................................................ 43

O.    (D) Plaintiff's Wrongful Termination Claim Fails. ................ 44

P.    (P) The Wrongful Employment Termination Claim Is
      Encompassed In the Arguments for Discrimination and
      Retaliation. ........................................................................... 44

Q.    (D) Plaintiff's Breach of Contract Claims (express oral contract
      and implied-in-fact contract not to terminate without good cause)
      Fail as a Matter of Law. ....................................................... 44

R.    (P) The Breach of Contract Claims Survive. ......................... 45

S.    (D) Plaintiff's Negligent Hiring, Supervision and Retention
      Claim Fails. ........................................................................... 46

T.    (P) Concialdi's Negligent Hiring, Supervision, and Retention
      Claim Should Survive. ......................................................... 47

U.    (D) Plaintiff's IIED Claim Fails as a Matter of Law. ........... 47

V.    (P) There Is a Disputed Issue as to Whether Defendants Engaged
      in Extreme or Outrageous Conduct........................................ 48

W.    (D) Plaintiff's Claim For Punitive Damages Fails As A Matter Of
      Law......................................................................................... 48

X.    (P) Punitive Damages Must Survive....................................... 49

IV.   PLAINTIFF'S ADDITIONAL EVIDENTIARY OBJECTIONS ................ 50

V.    JOINT CONCLUSION .......................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Barnett v. US. Air, Inc.*,
   228 F.3d 110 (9th Cir. 2000) ...................................................... 42

*Brown v. Lucky Stores, Inc.*,
   246 F.3d 1182 (9th Cir.2001) ...................................................... 42

*Cummings v. The Standard Register Co.*,
   265 F.3d 56 (1st Cir. 2001) ........................................................ 35

*Davis v. Tammac Corp.*,
   127 F.Supp.2d 625 (M.D. Pa. 2000) .......................................... 27

*Ercegovich v. Goodyear Tire & Rubber Co.*,
   154 F.3d 344 (3rd Cir. 1998) ...................................................... 35

*Faragher v. City of Boca Raton*,
   524 U.S. 775 (1998) .................................................................... 38

*Godwin v. Hunt Wesson, Inc.*,
   150 F.3d 1217 (9th Cir. 1998) .................................................... 29

*Harper v. Wallingford*,
   877 F.2d 728 (9th Cir. 1989) ................................................ 28, 29

*Harris v. Forklift Systems*,
   510 U.S. 17 (1993) ...................................................................... 39

*Jauregui v. City of Glendale*,
   852 F.2d 1128 (9th Cir. 1988) .................................................... 34

*Johnson v. Hertz Local Edition Corp.*,
   2004 WL 2496164 (N.D. Cal. Nov. 3, 2004) ............................. 44

*Kelly v. Drexel University*,
   94 F.3d 102 (3d Cir. 1996) ......................................................... 27

*McDonnell–Douglas Corp. v. Green*,
   411 U.S. 792 (1973) ........................................................ 25, 29, 36

*Nesbit v. Pepsico, Inc.*,
   994 F.2d 703 (9th Cir. 1993) ...................................................... 37

*Nidds v. Schindler Elevator Corp.*,
   113 F.3d 912 (9th Cir. 1996) ...................................................... 36

*Reeves v. Sanderson Plumbing Prods.*,
   530 U.S. 133 (2000) ............................................................. 33, 34

*Staub v. Proctor Hospital*,
   131 S.Ct. 1186 (2011) ................................................................. 36

*Village of Arlington Heights v. Met. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ............................................................... 34, 35

*Villiarimo v. Aloha Island Air, Inc.*,
  281 F.3d 1054 (9th Cir. 2002) ................................................. 28

*Zivkovic v. Southern California Edison Co.*,
  302 F.3d 1080 (9th Cir. 2002) ................................................. 43

**California Cases**

*Accardi v. Sup. Ct.*,
  17 Cal.App.4th 341 (1993) ...................................................... 47

*Addy v. Bliss & Glennon* (1996)
  44 Cal.App.4th 205 .................................................................. 41

*Alcorn v. Anbro Engineering, Inc.*,
  2 Cal.3d 493 (1970) ................................................................. 47

*Angie M. v. Sup. Ct.*,
  37 Cal.App.4th 1217 (1995) ................................................ 49, 50

*Artega v. Brink's, Inc.*,
  163 Cal.App.4th 327 (2008) .................................................... 44

*Avila v. Cont'l Airlines, Inc.*,
  165 Cal. App. 4th 1237 (2008) ............................................ 26, 42

*Brennan v. Townsend & O'Leary Enterprises*,
  199 Cal.App.4th 1336 (2011) .................................................. 39

*Brundage v. Hahn*,
  57 Cal.App.4th 228 (1997) ................................................. 25, 27

*Cabesuela v. Browning-Ferris Industries of California, Inc.*,
  68 Cal.App.4th 101 (1998) ...................................................... 48

*Caldwell v. Paramount Unified School Dist.*,
  41 Cal. App. 4th (1995) .......................................................... 28

*Cervantez v. J.C. Penney Co.*,
  24 Cal.3d 579 (1979) ............................................................... 47

*Christensen v. Superior Court*,
  54 Cal.3d 868, 2 Cal.Rptr.2d 79, 820 P.2d 181 (1991) ......... 47

*Coit Drapery Cleaners, Inc. v. Sequoia Insurance Co.*,
  14 Cal.App.4th 1595 (1993) ............................................... 46, 47

*Colarossi v. Coty US Inc.*,
  97 Cal.App.4th 1142 (2002) .................................................... 41

*Cole v. Fair Oaks Fair Prot. Dist.*,
  43 Cal.3d 148 (1987) ............................................................... 47

*Colmenares v. Braemar Country Club, Inc.*
   29 Cal.4th 1019 (2003) ................................................................. 25

*Cotran v. Rollins Hudig Hall Internal, Inc.,*
   17 Cal.4th 93 (1998) ................................................................... 45

*Dee v. Vintage Petroleum,*
   106 Cal.App.4th 30 (2003) .......................................................... 39

*DeJung v. Superior Court,*
   169 Cal.App.4th 533 (2008) ........................................................ 36

*Doe v. Capital Cities,*
   50 Cal.App.4th 1038 (1996) ........................................................ 46

*Evan F. v. Hughson United Methodist Church,*
   8 Cal.App.4th 828 (1992) ............................................................ 46

*Featherstone v. S. California Permanente Med. Grp.,*
   10 Cal.App.5th 1150 (2017) ........................................................ 27

*Flait v. North American Watch Corp.,*
   3 Cal.App.4th 467 (1992) ............................................................ 41

*Foley v. Interactive Data Corp.,*
   47 Cal.3d 654 (1988) .................................................................. 45

*Ford Motor Co. v. Homes Ins. Co.,*
   116 Cal.App.3d 374 (1981) .......................................................... 50

*Gelfo v. Lockheed Martin Corp.,*
   140 Cal. App. 4th 34 (2006) ................................................... 30, 43

*Guz v. Bechtel Nat'l, Inc.,*
   24 Cal.4th 317 (2000) ....................................... 28, 34, 36, 44, 45

*Hanson v. Lucky Stores, Inc.,*
   74 Cal.App.4th 215 (1999) .......................................................... 44

*Hersant v. Department of Social Services,*
   57 Cal.App.4th 997 (1997) .................................................... 28, 29

*Hughes v. Pair,*
   46 Cal.4th 1035 (2009) ............................................................... 48

*Janken v. GM Hughes Electronics,*
   46 Cal.App.4th 55 (1996) ............................................................ 48

*Jensen v. Wells Fargo Bank,*
   85 Cal.App.4th 245 (2000) ................................... 25, 32, 42, 43

*Livitsanos v. Super. Ct.,*
   2 Cal.4th 744 (1992) ................................................................... 47

*McLain v. Great Am. Ins. Cos.,*
   208 Cal.App.3d 1476 (1989) ................................................. 45, 46

*Mixon v. Fair Employment & Housing Com.*,
192 Cal.App.3d 1306 (1987) ...................................................................... 30

*Morgan v. The Regents of the University of California*,
88 Cal.App.4th 52 (2000) ................................................................... 28, 29

*Myers v. Trendwest Resorts*,
148 Cal.App.4th 1403 (2007) ................................................................... 39

*Nazir v. United Air Lines*,
178 Cal.App.4th 243 (2009) ..................................................................... 34

*O'Mary v. Mitsubishi Electronics America, Inc.*,
59 Cal.App.4th 563 (1997) ................................................................ 29, 35

*Pantoja v. Anton*,
198 Cal.App.4th 87 (2011) ....................................................................... 35

*Pensinger v. Bowsmith, Inc.*,
60 Cal.App.4th 709 (1998) ....................................................................... 25

*People v. Mendoza*,
192 Cal.App.3d 667 (1987) ....................................................................... 33

*Prilliman v. United Airlines, Inc.*,
53 Cal.App.4th 935 (1997) ....................................................................... 43

*Reeves v. Safeway Stores, Inc.*,
121 Cal.App.4th 95 (2004) ....................................................................... 36

*Reid v. Google*,
50 Cal.4th 512 (2010) ........................................................... 29, 31, 35, 38

*Reno v. Baird*,
18 Cal.4th 640 (1998) .............................................................................. 38

*Rope v. Auto-Chlor System of Washington Inc.*,
220 Cal.App.4th 635 (2013) ............................................................... 30, 32

*Sada v. Robert F. Kennedy Med. Ctr.*,
56 Cal.App.4th 138 (1997) ....................................................................... 25

*Sandell v. Taylor-Listug, Inc.*,
188 Cal.App.4thh 297 (2010) ............................................................. 30, 31

*Shoemaker v. Myers*,
52 Cal.3d 1 (1990) .................................................................................... 47

*Soria v. Univision Radio Los Angeles, Inc.*,
5 Cal.App.5th 570 (2016) ................................................................... 30, 32

*Starzynski v. Capital Public Radio, Inc.*,
88 Cal.App.4th 33 (2001) ......................................................................... 45

*White v. Ultramar, Inc.*,
21 Cal.4th 563 (1999) .............................................................................. 49

9

*Yanowitz v. L'Oreal USA, Inc.*,
    36 Cal.4th 1028 (2005) ............................................................... 30, 40

**California Statutes**

Cal. Civ. Code
    § 3294(b) ................................................................................................ 49

Cal. Civ. Proc. Code
    § 437c(e) ............................................................................................... 33

Cal. Gov. Code
    § 12926(m) ........................................................................................... 30
    § 12940 .................................................................................................. 30
    § 12940(h) ............................................................................................. 40
    § 12940(j)(1) ......................................................................................... 39
    § 12940(m) ...................................................................................... 42, 43
    § 12940(n) ............................................................................................. 42

Cal. Lab. Code
    § 2922 ............................................................................................. 44, 45
    § 3200 *et seq.* ..................................................................................... 47
    § 3600 .................................................................................................... 47
    § 3600(a) ............................................................................................... 46
    § 3601 .................................................................................................... 46
    § 3602(a) ......................................................................................... 46, 47
    § 5300 .................................................................................................... 47

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I.   **INTRODUCTIONS**

## A.   **Jacobs' Introduction**

Plaintiff Mark Concialdi ("Plaintiff" or "Concialdi") lost his job as an internal auditor with Defendant Jacobs Engineering Group Inc. ("Jacobs" or "Defendant") after a decision was made to restructure the Internal Audit group in the United States and add a new internal auditor in Europe.  Due to budget restrictions, adding an auditor in Europe required the elimination of a current auditor within the Internal Audit group.

Plaintiff was selected for the job elimination because he was the lowest performing auditor. He admits that the only time he disclosed his medical condition to Edd Pagano ("Pagano"), the decision maker, was **after** he was informed that his position was being eliminated.  Despite the meritless nature of Plaintiff's claims, he brings the following causes of action: disability and age discrimination, harassment, retaliation, failure to accommodate and engage in interactive process, breach of oral/implied in fact contract not to terminate without good cause, negligent hiring/supervision/retention, wrongful termination and intentional infliction of emotional distress.

Summary judgment must be granted because there is simply no credible evidence that anyone at Jacobs had any discriminatory animus towards Concialdi— whether because of his age or late disclosed medical condition.  Pagano was the sole decision-maker that selected Concialdi for job elimination, and it is undisputed that he did not have any knowledge of Plaintiff's disability.  Nor is there any evidence that Jacobs' legitimate business decision to restructure and add a new auditor position in Europe was pretext for illegal discrimination.  For these and other reasons, Jacobs respectfully requests that the Court grant summary judgment on each and every one of Concialdi's claims.

## B.   **Concialdi's Introduction**

Concialdi is a 58-year-old male with multiple sclerosis ("MS") who was

employed by defendant for nearly a decade as an internal audit manager before his employment was wrongfully terminated as part of alleged restructuring efforts and budget constraints.  However, when looked at more closely, defendant's reason for terminating Concialdi's employment is riddled with falsities and inconsistences.

*First*, the performance review scores that were purportedly used as the basis to select Concialdi for employment termination instead of others in his group were subjectively assigned to him by a new manager, Pagano, who admits that he did not have an adequate basis to evaluate Concialdi or the rest of his group for that 2015 performance cycle. Furthermore, these scores were assigned to Concialdi after Pagano met with chief executive officer Kevin Berryman ("Berryman") and knew that he had to eliminate a position in the internal audit department, where Concialdi worked.  At that time, Concialdi was the only disabled member of the internal audit department who was also over the age of 40.  He was replaced by a non-disabled individual.

*Second*, despite alleged budget issues in 2016 that limited the internal audit department to seven individuals, **the budget in 2017 allowed for two additional employees in that same department,** for a total of nine individuals in the internal audit department.  Concialdi's replacement was not hired until March of 2017, when the budget was not an issue.

*Third*, Pagano engaged in a campaign of harassment against Concialdi from the moment he became his manager in July of 2015, through Concialdi's termination in March of 2016. After Concialdi had a relapse of his MS in 2012, he lost feeling in his right leg and has been walking very slowly and with an obvious limp ever since. ***On nearly every single occasion that Pagano saw Concialdi***—once a week from July through December of 2015 and on other occasions beyond that—***Pagano made repeated remarks to Concialdi because of the way he walked and his "old age."*** No matter what response Concialdi gave him, Pagano *kept* making remarks to Concialdi, including ***"What's wrong with your leg?" "Go get it checked out," "Why do you walk like that?"*** and ***"Why are you walking so slow?"*** Pagano is hard pressed to

deny knowledge that Concialdi had a disability.  Additionally, Concialdi informed numerous personnel at Jacobs of his MS and even identified himself as disabled in response to an inquiry from human resources in November of 2015.

*Fourth*, there are numerous inconsistencies surrounding the reason for terminating Concialdi's employment and who the decision-makers were.  In his employment termination meeting, Concialdi was told that his position in Pasadena was being eliminated and that a spot was open in Italy, but the position filled was in Scotland.  Pagano also states in an e-mail that senior management's vision of the restructuring resulted in elimination of Concialdi's **Pasadena** location, but Pagano testified that he personally selected Concialdi for employment termination because of his low performance score compared to others.  Pagano also states that he was the sole decision-maker, but admits to consulting Berryman about eliminating the position.  The disputed facts demonstrate that Concialdi's employment was terminated for unfounded and patently pretextual reasons.

## II.    STATEMENT OF FACTS

### DEFENDANT'S STATEMENT OF FACTS

### A.    Plaintiff was an at-will employee while employed by Jacobs.

Plaintiff was hired in 2006 as an internal audit manager ("internal auditor") for Jacobs. (UF D1; Joint Evidentiary Appendix ("JEX") 1, pp. 10-12, 73-75 (Deposition of Mark Concialdi ("Pl. Depo.") 33:25-35:22; Ex. 2-Offer Letter and Employee Acceptance Statement).)  He worked out of Jacobs' Pasadena, California office.  (UF D2; JEX 1, p. 17 (Pl. Depo. 57:8-12).)

Plaintiff signed his offer letter and employee acceptance statement with Jacobs on October 23, 2006.  (UF D3; JEX 1, pp. 12-13, 58, 73-75 (Pl. Depo. 35:1-36:1; 166:3-18; Ex. 2.)  The Employee Acceptance Statement provides that:

> Jacobs is an employer at will; wherein, either party may conclude the employment relationship at any time. (UF D4; JEX 1, p. 58, 73-75 (Pl. Depo. 166:11-21; Ex. 2.)

Plaintiff admits that he signed Jacobs' at-will employment offer (UF D5;

JEX 1, pp. 58-59 (Pl. Depo. 166:6-167:4; Ex. 2), and he does not know of a policy at Jacobs that requires an employee be terminated only for good cause, (UF D6; JEX1, p. 59 (Pl. Depo. 167:16-20).

### B.    Plaintiff's Job Duties.

Plaintiff's job duties included conducting internal audits of Jacobs' systems and operations, developing recommendations to help various business units to improve efficiency, productivity and profitability, and to help prevent write-offs and losses. (UF D7; JEX 1, pp. 7-9, 70 (Pl. Depo. 24:22-25:13, 28:11-18; Ex. 1 – resume).)  To conduct an audit, Plaintiff would travel to an office, review documents and conduct interviews.  (UF D8; JEX 1, p.15-16, 21 (Pl. Depo. 44:22-45:21, 62:9-18).)  Concialdi was responsible for drafting audit reports after conducting an audit. (UF D9; JEX 1, p.15-16, 61-62 (Pl. Depo. 44:22-45:2, 178:12-179:13; Ex. 18); JEX 2, p.131 (Deposition of Edd Pagano ("Pagano Depo.") 191:2-6).)  The audit report goes to the board of directors and senior management, which are high level positions. (UF D10; JEX 1, p.22 (Pl. Depo. 63:11-18).)   Before an audit report goes to the Board, Concialdi would give a draft to his supervisor Edd Pagano for review and approval. (UF D11; JEX 1, pp. 22-23 (Pl. Depo. 63:24-64:9).)

Plaintiff admits that in order to be a good auditor, one must be able to interview well, have good writing ability, submit reports in a timely manner, and maintain a good relationship with internal customers.  (UF D12; JEX 1, p. 18, 21, 23-24 (Pl. Depo. 59:22-25, 62:19-24; 64:10-13, 64:14-65:2).)  He admits it is important for audit reports to contain a complete and thorough analysis and investigation of the audit. (UF D13; JEX 1, p. 25 (Pl. Depo. 66:12-15).)

### C.    Concialdi's Poor Job Performance is Rated at an Overall "2" out of 5 for his 2015 Performance Review – Lowest Among the Auditors.

Edd Pagano ("Pagano") became Vice President of Internal Audit in July 2015. (UF D14; JEX 2, p.123 (Pagano Depo. 25:21-24).)  From July to December 2015, Pagano worked out of the Jacobs Pasadena office. (UF D15; JEX 3, p.147

(Declaration of Edd Pagano ("Pagano Decl.") ¶ 3).) He relocated to the Jacobs Houston, Texas office on or around January 1, 2016. (UF D16; *Id* (Pagano Decl. ¶4).) After relocating to Houston, Pagano would return to the Pasadena office approximately once a month for business. (UF D17; *Id.* (Pagano Decl. ¶5[1].) Concialdi admits that Pagano was a "typical manager" (UF D18; JEX 1, p. 14 (Pl. Dep. 38:8-11), and that he "got along with Edd," (UF D19; *Id.* (Pl. Depo. 38:12-14).

### 1. <u>Concialdi's Audit Reports Are Poorly Drafted and Require Multiple Revisions Before Sending to the Board of Directors.</u>

In October 2015, Concialdi submitted his initial draft of an audit report entitled "2015-008 Unpredictable Events Review South Africa ELP" ("South Africa Report"). (UF D20; JEX 3, p. 148 (Pagano Decl. ¶ 10; JEX 4 (South Africa report).) After reviewing the report, Pagano found the report poorly worded, overall difficult to follow, and lacked clarity. (UF D21; JEX 3, p. 148-49 (Pagano Decl. ¶ 11).) Examples include:

- Three periods ("…") were left at the end of a sentence for no reason. (UF D22; JEX 3, p. 149 (Pagano Decl. ¶11; JEX 4, p. 160, comment "PE1").)

- On page 5 of 9, Concialdi referred to an "access control" in the first two columns, but then in the Notes column he mentioned an "access panel" without identifying what an access panel is. (UF D23; JEX 3, p. 149 (Pagano Decl. ¶ 11; JEX 4, p. 164, comment "PE5".)

- On page 6 of 9, there was a recommendation that the alarm be linked to an armed response company, but in the next column he indicates an alarm system was fitted but makes no mention of whether it was linked to an armed response company. (UF D24; JEX 3, p. 149 (Pagano Decl. ¶ 12; JEX 4, p. 165, comment "PE6 and PE7").) Also, this status should have been a "red light" versus what was

---

[1] Plaintiff Evidentiary Objection: Pagano's statement: "…I made return trips to Jacobs' Pasadena office approximately once a month." Grounds for objection: Vague and ambiguous, lacks evidentiary support, conclusory evidence.

indicated (green light),[2] since this item was not resolved from what was indicated in the status column.  (UF D26; JEX 3, p. 149 (Pagano Decl. ¶ 12; JEX 4, p. 165, comment PE6 and PE7).)

• On page 7 of 9, there was a recommendation that the emergency exit doors open only from the inside, and the status column indicates the same as the recommendation (i.e., that the doors open only from the inside).  (UF D27; JEX 3, p. 150 (Pagano Decl. ¶ 15; JEX 4, p.166, comment "PE13").) It therefore should have been green status, yet Conciardi incorrectly indicated it as red light status meaning the recommendation wasn't achieved. (UF D28; *Id.*)

• Two rows of items had "no recommendation" listed to begin with in the recommendation (left) column, yet comments were put in the status column and indicated "green light" status. (UF D29; JEX 3, p. 150 (Pagano Decl. ¶ 15; JEX 4, p. 166, comment "PE14").) Without recommendations, these items should not even be on the report. (UF D30; *Id.*)

In total, Pagano made **over 20 comments** to Plaintiff's initial draft, which is **twice the amount** of comments he normally had to make during an initial review of an internal audit report.[3] (UF D31; JEX 3, p.150 (Pagano Decl. ¶ 16[4]).)

The second draft of the South Africa Report still had several issues, including a sentence structure error, spelling errors, and lack of clarity in Conciardi's findings. (UF D32; JEX 3, p. 150 (Pagano Decl. ¶ 17; JEX 5).)  Conciardi admitted this draft he sent to Pagano was supposed to be his <u>final</u> draft.  (UF D33; JEX 1, pp. 63-65, 104 (Pl. Depo. 180:21-181:7, 182:5-7; Ex. 20 (second draft of South Africa report).) However there still were several errors.  For instance, the word "Recommendations"

---

[2] A red status means that compared to the recommendation the auditee did not achieve the recommendation; a yellow status means partial credit, not fully resolved; and a green status indicates all issues resolved. (UF D25; JEX 3, p. 149 (Pagano Decl. ¶ 13).)

[3] See Pagano Decl. ¶¶ 10-15 for additional comments made to the report.

[4] Plaintiff Evidentiary Objection. Pagano statement: "I made 20 comments….about twice the amount of comments I normally had to make for during an initial review of an internal audit report." Grounds for objection: Vague and ambiguous, conclusory statement, lacks foundation.

was incorrectly spelled as "Recomm3ndations" with a "3" in the middle of the word. (UF D34; JEX 3, p. 150 (Pagano Decl. ¶ 17; JEX 5, p. 188 (comment "PE3").) Concialdi also admitted that the sentence he wrote on page 7 of the report "**doesn't make sense.**" (UF D35; JEX 1, pp. 63-65, 112 (Pl. Depo. 180:21-182:20 (referring to sentence on Ex. 20, page 7 of 14, Bates No. JACOBS000045, "PE1").)

Concialdi agreed that a reasonable manager would not expect to see these errors in a report:

> Q    Is it reasonable, as a manager, for [Pagano] not to expect that these
>        errors be in your report?
>
> A    **Yes.**  (UF D36; JEX 1, pp. 65-66 (Pl. Depo. 182:21-183:4).)

Finally, the third draft still was not error free since Pagano had two comments that remained unanswered. (UF D37; JEX3, p.151 (Pagano Decl. ¶18; JEX 6, p.193.)

In November 2015, Concialdi submitted an initial draft of an audit report entitled "2015-015 Field Services Procurement Review Draft – ELP Nov. 2 2015" ("Field Services Procurement Report").  (UF D38; JEX 3, p. 151 (Pagano Decl. ¶ 19; JEX 7.) This report again concerned Pagano due to Concialdi's poor choice of wording and lack of definitions, and Pagano had several questions surrounding the lack of clarity in the report's findings.  (UF D39; *Id.* (Pagano Decl. ¶ 19 (referring to comments made to report).)

Concialdi returned a second draft of the Field Services Procurement Report, again with errors.  For instance, he incorrectly stated that four areas were assessed, where only three areas were listed in the report.  (UF D40; JEX 3, p.151 (Pagano Decl. ¶ 20; JEX 8, p. 207, comment "PE2").  In section 2.0 of the report (under "Findings") Concialdi included a "red/yellow/green light" chart which indicated that Upstream - Odessa (#2 on the list under chart) had a yellow light for the "approved material requisitions" finding, but there was no explanation in the "findings/recommendation" section indicating why they were at yellow or what recommendations were made for them to move from yellow to green. (UF D41; JEX

3, p. 151-52 (Pagano Decl. ¶ 20; JEX 8, p. 208, (comment "PE3" referring to chart). Compared to the other auditors within the Internal Audit group, Pagano did not have the same number of issues with errors and lack of clarity, and the need to comment on the various deficiencies of a report as he did above with Concialdi. (UF D42; JEX 3, p. 152 (Pagano Decl. ¶ 21).)

Concialdi also misspelled the word "Hotline" as **"Horline"** in the subject line of an e-mail that was directly addressed to a Vice President of Jacobs. (UF D43; JEX 3, p. 152 (Pagano Decl. ¶ 22; JEX 9, p. 214).)  Pagano believed this poorly reflected on Concialdi and on the overall reputation of the internal audit group. (UF D44; *Id*.) On Sept. 8, 2015, Concialdi failed to give a timely update to the assistant for the Internal Audit department (UF D45; JEX 3, p. 152 (Pagano Decl. ¶ 23; JEX 10, p. 216), and again on Nov. 11, 2015, Pagano needed to ask Concialdi where his updates were for two audits which were overdue, (UF D46; JEX 3, p. 152 (Pagano Decl. ¶ 24; JEX 11, p. 218).

## 2.    Concialdi is Evaluated as the Lowest Performing Auditor.

By the first week of March 2016, Pagano had completed the 2015 annual performance reviews for all the internal auditors, including the scoring elements contained in each auditor's review.  (UF D47; JEX 3, p. 152-53 (Pagano Decl. ¶ 25; JEX 12, pp. 220-26.)  Pagano then met (either in person or via phone call) with each auditor over the next 1-2 weeks to discuss their reviews. (UF D48; *Id*.)

For Concialdi's 2015 performance review, Pagano noted particular areas that were sub-par and needed improvement.  For instance, he received scores of "2" out of 5 in the categories of (1) Work Methods & Results Focus, (2) Decision Making & Problem Solving, and (3) Communications. (UF D49; JEX 3, p.153 (Pagano Decl. ¶ 26; JEX 12, pp. 222-224).)  Under the "manager's comments" section Pagano noted that Concialdi needed to improve on his writing skills, the quality of his reports, and needed to be more timely with his reports and achieve estimated completion dates. (UF 50; JEX 3, *Id*. at ¶ 26; JEX 12, p. 222).)  Concialdi also told Pagano that he

considered people to be "**guilty until proven innocent**" and "**I think people are evil.**" (UF D51; JEX 3, *Id.* at ¶ 26; JEX 12, p. 223).)  Pagano did not consider this to be a professional attitude or viewpoint to have, especially as an internal auditor.  (UF D52; JEX 3, *Id.* at ¶ 26.)  Pagano noted that Concialdi's reports required much "back and forth" between them to impart a clear message to the reader, which consumed a lot of his time to accomplish. (UF D53; JEX 3, *Id.* at ¶ 26; JEX 12, p. 224.)

Concialdi even noted in his self-assessment in the employee comments/Areas for Improvement section (left side of evaluation) that his "speaking skills need improving. I need to control my nervousness and slow down when speaking. I need to ad-lib less and think more before speaking," (UF D54; JEX 1, p. 26, 81 (Pl. Depo. 90:1-20; Ex.10 (Bates No. JACOBS000130), and admitted that being able to interview well is important in order to be a good auditor. (UF D55; JEX 1, pp. 18, 20 (Pl. Depo. 59:22-25, 61:8-12.)  He also agreed that he did **not** timely complete his assignments.  (UF D56; JEX 1, pp. 26, 80 (Pl. Depo. 90:1-20; Ex.10 (JACOBS000129, comment by Concialdi upper left of page).)

Overall, Concialdi received a score of "2" out of 5, which is defined as "**Partially Meets – does not consistently meet expectations, some improvement needed.**"  (UF D57; JEX 3, p. 153 (Pagano Decl. ¶ 27; JEX 12, p. 225.) This was the lowest overall score among all of the internal auditors that Pagano evaluated for 2015. (UF D58; JEX 2, p. 138-40 (Pagano Depo. 269:3-15, 271:14-272:1); JEX 3, p. 153, Pagano Decl. ¶27.)

D.    **The decision is made to add an internal auditor based in Europe; Concialdi's position is selected for elimination based on being the lowest performing auditor.**

The restructuring of Jacobs into a "line of business" organization was announced towards the end of 2015. (UF D59; JEX 2, p. 136-37 (Pagano Depo. 214:23-215:16.)  On or around January 2016, Pagano had an in-person meeting with the Chief Financial Officer for Jacobs, Kevin Berryman ("Berryman"), to discuss how

the restructuring would affect the Internal Audit department. (UF D60; JEX 3, p.147 (Pagano Decl. ¶ 6); JEX 13, p. 229 (Berryman Decl. ¶ 4).)  At this meeting Berryman and Pagano made the decision to add an internal auditor in Europe to help support operations there. (UF D61; JEX 3, p. 147 (Pagano Decl. ¶ 7); JEX 13, p. 229 (Berryman Decl. ¶ 5.)  The reason for this decision was because Jacobs' second largest footprint was in Europe, and they decided that business operations in that continent would greatly benefit from having an auditor based out of Europe.  (UF D62; *Id.* (both).)

In order to add an auditor based in Europe, Pagano was required to stay within his Internal Audit budget which at the time only allowed for a total of seven auditors. (UF D63; JEX 3, p.148 (Pagano Decl. ¶8); JEX 13, p. 230 (Berryman Decl. ¶6[5].) Therefore, he needed to eliminate a then-current internal auditor position in order to add the new auditor position in Europe. (UF D64; *Id.* (both).)

After he completed the 2015 performance reviews for all of his internal auditors, Pagano decided on which internal auditor would be selected for the job elimination. (UF D65; JEX 3, p.153 (Pagano Decl. ¶ 28).)  Based on his knowledge of the auditors' strengths and weaknesses, and based on Concialdi's 2015 performance review which was an overall "2" out of 5 and was the lowest among all the auditors, Pagano selected Concialdi for the job elimination. (UF D66; *Id.*)  Pagano was the only person involved in the decision to select Concialdi for the job elimination. (UF D67; JEX 3, p.154 (Pagano Decl. ¶ 29[6]).)

On March 28, 2016, Pagano sent an e-mail to Human Resources Business Partner Matt Dehamel ("Dehamel") with a selection matrix noting the scoring breakout of the U.S.-based internal auditors and his selection of Concialdi for layoff.

[5] Plaintiff Evidentiary Objection. Berryman statement: "Mr. Pagano was required to stay within his current Internal Audit Budget which at the time allowed for seven (7) auditors." Grounds for objection: Vague and ambiguous, conclusory statement, lacks foundation.

[6] Plaintiff Evidentiary Objection. Pagano statement: "I was the only person who had any involvement in the decision to select Concialdi for the job elimination." Grounds for objection: Vague and ambiguous, conclusory statement, lacks foundation.

(UF D68; JEX 3, p. 154 (Pagano Decl. ¶ 30, JEX 14, p. 232-34 (selection matrix).) The scores noted for the various categories in the selection matrix were taken from the scores that Pagano assigned to each auditor's evaluation. (UF D69; *Id*.)

**E.    Concialdi Admits that he Informed Pagano of his MS only After Being Told His Job was Being Eliminated.**

On March 30, 2016, Pagano and Dehamel met with Concialdi to inform him that his position was being eliminated. (UF D70; JEX 3, p. 154 (Pagano Decl. ¶ 31).) Plaintiff admits that he had "no idea" that Pagano was going to terminate him. (UF D71; JEX 1, p. 27 (Pl. Depo. 101:5-18).)  During that meeting, and only **after** he was informed that his job was eliminated, did Concialdi then inform Pagano and Dehamel for the first time that he had MS.  (UF D72; JEX 1, p. 28, 30 (Pl. Depo. 102:1-19; 104:9-19; JEX 3, p. 154 (Pagano Decl. ¶ 32).)   Concialdi was given two weeks' notice and his termination date was April 12, 2016. (UF D73; JEX 3, p. 154 (Pagano Decl. ¶ 31; JEX 15; pp. 236-37).)

Concialdi applied for disability benefits later that same day after being informed of the job elimination. (UF D74; JEX 1, p.28-29, 36 (Pl. Depo. 102:24-103:14, 136:10-16).)  Concialdi's application for disability benefits was approved. He received short term disability benefits, then long term disability benefits, and also social security benefits. (UF D75; JEX 1, p. 36-37 (Pl. Depo. 136:13-137:115); JEX 16, 17, 18 (disability benefits approval notices produced by Plaintiff).) Plaintiff's benefits were retroactive and based on a date of disability of March 31, 2016. (UF D76; JEX 16, 17, 18, pp. 238-251.)

**F.    Pagano only saw Concialdi walking with a limp on two or three occasions in 2015.**

After admitting that he did not disclose his disability to Pagano until after he was informed of his termination, Concialdi participates in a futile exercise of speculation—asserting that Pagano must have known of his disability because he saw him limp. However, such a claim is not supported by the facts.

Pagano did not see Concialdi often when at work.  (UF D77; JEX 2, p. 135 (Pagano Depo. 209:3-12).)  Pagano and Concialdi worked on different floors at the Pasadena building: Pagano was on floor eleven, Concialdi was on floor five and then moved to the first floor. (UF D78; *Id*.)  Plaintiff also admits that Pagano transferred to Houston on or around November/December 2015. (UF D79; JEX 1, p. 42 (Pl. Depo. 145:2-7).) Once Pagano was in Houston, Concialdi admits that Pagano "stayed in Houston." (UF D80; *Id. (P*l. Depo. 145:8-12).)

While Pagano did see Concialdi walk with a limp on a couple occasions prior to his departure to Houston, simply seeing him with a limp does not support the contention that he was aware of a disability. (See UF D81; JEX 2, pp. 132-33 (Pagano Depo. 204:24-205:8).) The first time Pagano noticed the limp he asked Concialdi what had happened. (UF D82, JEX 2, p. 133 (Pagano Depo. 205:9-14).) Concialdi responded that he, "had a problem with his knee" and that he needs to get it checked out." (UF D83; *Id. (P*agano Depo. 205:15-19).) Concialdi admits that the comments Pagano made about the limp did **not** occur often: "It wasn't that often." (UF D84; JEX 1, pp. 41-42 (Pl. Depo. 144:13-145:7).)

In fact, Concialdi admits that he only met with Pagano between July to November 2015 (UF D85; JEX 1, p. 41-42 (Pl. Depo. 144:13-145:7), and then only once a week at most, (UF D86; JEX 1, p. 43 (Pl. Depo. 146:7-13).  The frequency of their meetings could have been less if Concialdi was traveling or if Pagano was traveling. (UF D87; JEX 1, p. 42 (Pl. Depo. 145:16-25).)  Concialdi responded to Pagano's concerns about the limp by stating "I got a bad knee, it's old age, just trying to brush it off." (UF D88; JEX 1, pp. 33-34 (Pl. Depo. 132:16-133:1.)  Plaintiff admits that on November 25, 2015, he sent an email to Pagano about his knee condition:

> Got back from the Ortho guy. He poked, pulled, pushed, and twisted my knee every which way. Says the torn meniscus is not my problem and I should be able to live all my remaining years with it. But my knee cap is a mess and that's what is causing all the problems. Says a shot of cortisone and some physical therapy **should make it all better.** So he

gave me a shot in the knee cap and a Rx for PT. Wants to see me in a month and **says I'll be fine by then**.

(UF D89; JEX 1, pp. 34-35, 83 (Pl. Depo. 133:17-134:11; Ex. 16 (emphasis added).)

A few months later, sometime in the January/February 2016 time frame, Pagano returned to Pasadena for a business trip and saw that Concialdi was no longer walking with any sort of a limp. (UF D90; JEX 3, p. 154 (Pagano Decl. ¶ 33[7]).)  In fact Pagano never saw Concialdi walk with a limp or in any other manner that was out of the ordinary after he moved to Houston. (UF D91; JEX 3, p.155 (Pagano Decl. ¶ 34.)  Pagano also never observed Concialdi walk with or otherwise use a cane while he was employed at Jacobs. (UF D92; JEX 3, p.155 (Pagano Decl. ¶ 35).) Because Pagano did not see Concialdi walking with a limp, he assumed that Concialdi had gotten his knee taken care of. (UF D93; JEX 2, p. 134 (Pagano Depo. 207:19-25).)

It is also undisputed that Plaintiff: (1) never asked for an accommodation prior to being informed he was being terminated (UF D94; JEX 19, p. 254 (Deposition of Matt Dehamel ("Dehamel Depo.") 113:3-8); JEX 2, p. 141 (Pagano Depo. 338:6-8)); (2) never used a cane or other assistive device while at work (UF D95; JEX 3, p. 155 (Pagano Decl. ¶ 35); (3) never requested a medical leave of absence (UF D96; JEX 1, p.32 (Pl. Depo. 128:10-12) and (4) had no work restrictions or limitations, (UF D97; JEX 1, p. 38 (Pl. Depo. 139:3-7).

## G.    Concialdi Never Submitted Any Complaint Regarding Pagano.

Concialdi did not report Pagano's comments to anyone in management, the integrity hotline, or Human Resources pursuant to Jacobs' anti-harassment policy. (UF D98; JEX 1, pp. 44-45, 53-56, 84-87 (Pl. Depo. 149:13-150:20, 158:18-161:3; Ex. 17.)  He also admits that he never submitted a complaint regarding Pagano. (UF

---

[7] Plaintiff's Evidentiary Objection. Pagano statement: "…I saw Concialdi in the Pasadena office and he was not walking with any sort of a limp and I did not see anything out of the ordinary in how he was walking." Grounds for objection: Conclusory statement, lacks foundation, vague and ambiguous.

D99; JEX 1, pp. 47-48 (Pl. Depo. 152:10-153:4.) At best, Plaintiff alleges that he "vented" to two other co-workers (Peggy and Louise) about Pagano. (UF D100; JEX 1, pp. 48-49 (Pl. Depo. 153:18-154:9).) Peggy and Louise are auditors in the internal audit group and are not supervisors. (UF D101; JEX 1, p. 31 (Pl. Depo. 105:1-4).)

## PLAINTIFF'S STATEMENT OF FACTS

### A. Concialdi's History of Excellent Performance.

Concialdi, a 58-year-old male with multiple sclerosis, was employed by defendant as an internal audit manager for nearly a decade before he was selected for employment termination on the basis of his performance scores compared to the rest of his group, as part of restructuring efforts and purported budget constraints. (Plaintiff's Additional Facts ("P"), P1-P3; JEX 15, pp. 235-237; JEX 14, pp. 231-234; JEX 37, p. 426, Concialdi Decl., ¶ 2.) The performance scores that were used as a basis to terminate Concialdi's employment were subjectively assigned to him by his new manager, Pagano, who harassed Concialdi and made remarks about his being old and walking slowly and with a limp. (P4-P5; JEX 12, pp. 219-226; Pagano Depo., 257:22-25; JEX 37, p.430, Concialdi Decl., ¶ 16.) Pagano even admitted that he did not have a proper basis to evaluate Concialdi or the other auditors for that review period. (P6; Pagano Depo., 166:8-167:6.) Despite Pagano's low review scores, he admits that Concialdi was a good auditor. (P7; Pagano Depo., 272:2-22.) Concialdi's previous managers spoke highly of his performance and gave him scores of meets and exceeds expectations on his reviews. (P8; JEX 24, 25, 26, 27, pp. 297-320; JEX 37, pp. 429-430; Concialdi Decl., ¶ 15.)

### 1. Concialdi's Managers Speak Highly of His Ability and Work.

Gus Hubert ("Hubert"), Concialdi's first manager, wrote on Concialdi's 2007 performance review, ***"Mark has the qualifications and experience to run this organization."*** (P9; JEX 24, pp. 297-300; JEX 37, p. 426, Concialdi Decl., ¶ 3 (Hubert managed Concialdi from 2006 through December of 2011).)

Tom Plante ("Plante"), Concialdi's second manager, was ***"extremely happy***

*with [Concialdi's] work and contributions."* (P10; JEX 28, pp. 321-322.)   In his 2013 performance review, Plante described Concialdi as a *"Very thorough and professional auditor and highly effective investigator."* (P11; JEX 26, pp. 305-311.) Both Hubert and Plante were happy with Concialdi's performance at all times. (P12; JEX 37, p. 429, Concialdi Decl., ¶¶ 10, 14.)

**B.     In 2009, Concialdi Is Diagnosed with Multiple Sclerosis and Informs Management, Human Resources, and His Co-Workers of the Diagnosis.**

In or around 2009, Concialdi was diagnosed with multiple sclerosis ("MS"). (P13; Pl. Depo., 109:22-110:6; JEX 37, pp. 426-427, Concialdi Decl., ¶ 5 (MS causes disrupted communication between the body and the brain).)   Of the approximately eight members of the internal audit department during his employment, Concialdi was the only auditor who had a disability and requested accommodations. (P14; Sanchez Depo., 143:8-22.) Members of the internal audit department were all approximately in their 40s and 50s. (P15; Sanchez Depo., 176:9-23.)   Concialdi was also the only internal audit manager in the U.S. who did not work remotely from home and was assigned to a physical office location. (P16; Pagano Depo., 112:18-113:4.) Other than causing him more difficulty in traveling, Concialdi's MS did not affect his work performance. (P17; JEX 37 pp. 426-427, Concialdi Decl., ¶ 5.)

**1.     Concialdi Informs Manger Gus Hubert of His MS Diagnosis in 2009.**

Hubert was the first person Concialdi informed of his MS diagnosis in 2009. (P18-P19; Pl. Depo.,109:19-110:20 (Concialdi informed Hubert the week before he was scheduled to fly out to conduct an audit because his doctors did not want him traveling until further testing was conducted); JEX 37, p. 427, Concialdi Decl., ¶ 6.)

**2.     Concialdi Informs Krishna Nunnelly in Human Resources of His MS by Early 2010.**

In or around late 2009 or early 2010, Concialdi informed Krishna Nunnelly ("Nunnelly") in human resources that he had MS. (P20; Pl. Depo., 111:12-112:7; JEX

37 p. 427, Concialdi Decl., ¶ 7.)

> **i.    Nunelly Tells Concialdi There Is No Need to Tell Anyone About His MS.**

During their discussion, Nunelly instructed Concialdi that he was not required to tell anyone about his diagnosis. (P21; Pl. Depo., 111:12-112:7, 127:10-17; JEX 37, p. 427, Concialdi Decl., ¶ 7.)  Nunelly told Concialdi to take leave if he needed to stay home because of his exhaustion, but never identified what type of leave was available to him, nor did she offer to let Concialdi work from home, as the other auditors did. (P22; *Id.*)

> **3.    Concialdi Informs His Co-Workers Peggy Burns and Louise Evered of His Condition.**

In or around 2010, Concialdi informed Peggy Burns ("Burns") of his MS. (P23; Pl. Depo., 105:22-106:5; JEX 37, p. 428, Concialdi Decl., ¶ 9.)   In 2012, he told Louise Evered ("Evered") about his MS. (P24; Pl. Depo., 105:8-21; JEX 37, p. 427, Concialdi Decl., ¶ 9.)  Evered and Burns are also internal audit managers. (P25; JEX 37, p. 427, Concialdi Decl., ¶ 9.)

> **4.    Concialdi Suffers a Relapse of His MS in 2012, and by 2013 His Right Leg Becomes Numb, and He Begins Walking Very Slowly and with a Noticeable Limp.**

In or around 2012, Concialdi had a relapse, and his MS became much worse. (P26; Pl. Depo., 106:6-12; JEX 37, pp. 428-429, Concialdi Decl., ¶ 12.)  By January of 2013, he was walking significantly more slowly, with an abnormal gait, because he had balance problems and numbness in his feet, and this resulted in his not knowing where his feet were and caused him to start walking with a noticeable limp. (P27-P28; JEX 37, pp. 428-429, Concialdi Decl., ¶ 12.)

From January of 2013 to the present, Concialdi has always walked slowly and with a limp. (P29; JEX 37, pp. 428-429, Concialdi Decl., ¶ 12.)   Joanna Radacina ("Radacina"), a former employee of Jacobs who worked in the Pasadena location with

Concialdi, stated, *"You would have to be blind not to see that there was something wrong with the way [Concialdi] was walking,"* and *"It was very obvious that Mr. Concialdi had some kind of physical ailment based on the way he was walking."* (P30-P32; JEX 32 p. 330, Radacina Decl., ¶¶ 2-3.)

> ### 5.   After His Relapse in 2012, Concialdi Informs Plante that He Has MS.

Concialdi told Plante about his MS in 2012, after his relapse, and asked to take a few days off. (P33; Pl. Depo., 106:6-12.)  Concialdi had to use his paid time off ("PTO") to take time off for his MS. (P34; JEX 37, p. 427, Concialdi Decl., ¶ 12.) Concialdi did not even know what medical leave was or whether defendants offered it. (P35; Pl. Depo., 127:8-128:20.)

> ## C.   Before Hiring Pagano, Kevin Berryman Informs Him that He Needs to Bring Up the "Integrity" of the Department.

Berryman, the chief financial officer of Jacobs, told Pagano in an interview for the vice president of internal audit position around April of 2015 that part of his job required him to restore the "integrity" of the internal audit department. (P36; Pagano Depo., 71:5-78:23.) Pagano could not recall many of the specifics of that conversation with Berryman. (P37; Pagano Depo., 77:18-80:3.)

> ## D.   Pagano Takes Over as Vice President of Internal Audit in July of 2015 and Immediately Begins to Harass Concialdi.

From July through December of 2015, Concialdi ran into Pagano approximately once a week. (P38; Pl. Depo., 144:13-146:13.)  Nearly every time Concialdi ran into him, Pagano made a remark about how he was walking or about his age, such as *"Why are you walking that way?" "Why are you walking so slow?" "What's the matter with your leg?" "You should get that checked out," "Why are you limping?" "Old age,"* and other comments of that nature. (P39-P40; Pl. Depo., 132:14-133:1, 139:21-141:12, 142:13-18, 144:13-146:13; JEX 37, p. 430, Concialdi Decl., ¶ 16.) Pagano even responded to Concialdi's e-mail about going to the doctor and having a

"messed up knee cap" with ***Men of certain age!*** implying that Concialdi was old. (P41; JEX 29, p. 324; JEX 38; Pl. Depo., 139:21-141:12.)

Even after Pagano relocated to Houston, around December of 2015, he continued to make these remarks to Concialdi when he came to Pasadena for visits until his employment termination in March of 2016. (P42-P47; Pl. Depo., 144:13-146:13; JEX 37, pp. 430-431, Concialdi Decl., ¶¶ 16-19 (Pagano came to Pasadena at least once in January or February and on at least three occasions in March of 2016; the first occasion in March was on Concialdi's birthday, the second in mid- to early March, when the two met to discuss Concialdi's performance evaluation, and the third at Concialdi's employment termination meeting).) In response to Pagano's comments, Concialdi even told Pagano that he had a bad leg. (P48; Pl. Depo., 144:13-146:13.)

**E.**    **Concialdi Is Extremely Offended by Pagano's Remarks, and They Caused Him Anxiety.**

Concialdi became nervous and anxious at work because of Pagano's remarks. (P49; JEX 37, p. 430, Concialdi Decl., ¶ 17.) With MS, people do not age well; therefore, Pagano's comments about how Concialdi walked and his old age were particularly offensive. (P50; Pl. Depo., 148:17-23.)

**F.**    **Pagano's Low Review Scores for Concialdi Contradict His Testimony Surrounding Concialdi's Performance.**

Pagano admits that Concialdi was a "Good Auditor" and that "He knew how to audit. He had good experience." (P51; Pagano Depo., 272:2-22.)

**1.**    **Pagano Testifies that Concialdi's "Guilty Until Proven Innocent" Approach to Investigations Had "Nothing" to Do with His Decision to Terminate Concialdi's Employment.**

Pagano testified that, while he did not agree with Concialdi's "guilty until proven innocent" approach, it was not the reason for Concialdi's discharge. (P52; Pagano Depo., 259:19-264:3.) Pagano talked to Concialdi about his method, and Concialdi appeared to change his approach in response. (P53; *id.*) Still, Pagano raised

this on Concialdi's performance review as an issue, despite testifying that it was taken care of after their prior discussion. (P54; *id.;* JEX 12, pp. 219-226.) Concialdi's "Horline" typo similarly was not made into an issue at the time, even though defendant now points to this one typographical error as a monumental downfall in Concialdi's performance. (P55; JEX 37, p. 433, Concialdi Decl., ¶ 25.)

**2.** **Concialdi and His Co-Workers Discuss How Pagano Was Extremely Critical of Their Work, But Treated Concialdi Worse than the Others.**

Concialdi spoke to Burns and Evered about Pagano's unfair and harassing treatment of him, and Evered expressed that she noticed that Pagano was treating him badly. (P56; Pl. Depo., 149:7-10; JEX 37, pp. 429-430, Concialdi Decl., ¶ 15.) Pagano made lots of corrections on Burns's and Evered's work, as well, but was particularly critical of Concialdi. (P57; JEX 37, pp. 429-430, Concialdi Decl., ¶ 15.)

**3.** **The South Africa Report Is the First Risk Assessment Audit and Report Concialdi Had Ever Done in His Career.**

The South Africa audit and report for which Concialdi was criticized was originally assigned to Burns, but reassigned to Concialdi because Burns had taken time off. (P58; JEX 37, pp. 432-433, Concialdi Decl., ¶ 23.) Furthermore, Concialdi had never done a risk assessment audit or report before, and that caused him to make mistakes on it. (P59; *id.*) The type of format used for the South Africa report was also brand-new and had never been used before. (P60; *id.*)

**4.** **The Assistant for the Internal Audit Department Was in Charge of Fixing Grammatical Errors in Reports.**

The three periods (…) were probably made by Jennifer Ward ("Ward"), the assistant to the internal audit department, who made these marks in places where she had inquiries. (P61; JEX 37, p. 433, Concialdi Decl., ¶ 24.) Pagano's criticisms about grammar were premature, as Ward was responsible for going through the final version and correcting grammatical errors. (P62; *id.*) Similarly, Pagano was harassing

Concialdi by asking for updates for his two audits that were "overdue," as they were not overdue because Ward sent out reminders beforehand of when they were going to be due and had not done so yet. (P63; JEX 37, p. 433, Concialdi Decl., ¶ 26.)

**G.    In November of 2015, Concialdi Replies Affirmatively to a Request from Human Resources to Disclose His Disability Status.**

In or around November of 2015, human resources sent out an e-mail requesting that Concialdi and others identify their veteran and disability status. (P64; Pl. Depo., 125:19-126:24.)  Concialdi checked off the "disabled" box and submitted his response to human resources.  (P65; *id.*)   This occurred around the same time that Jacobs announced its restructuring.  (P66; Pagano Depo., 214:23-215:16.)

**H.    Aside from His Informing Pagano of His Bad Leg and Disclosing His MS to Numerous Personnel at Jacobs, It Was Apparent from Watching Concialdi Walk that He Had a Disability.**

Dehamel, the human resources partner, observed Concialdi walking slowly and with a limp on at least two occasions. (P67; JEX 37, p. 433, Concialdi Decl., ¶ 28.) On one occasion, Dehamel asked Concialdi, "Why are you walking that way?" and Concialdi responded that he had a bunion. (P68; *id.*)  However, Dehamel said that, of the approximately five times he saw Concialdi, he noticed Concialdi walking slightly slowly on only two occasions, and he failed to mention that he inquired about Concialdi's walking. (P69; Dehamel Depo., 126:22-127:24.) Berryman also observed Concialdi walking slowly and with a limp on at least two or three occasions. (P70; JEX 37, p. 433, Concialdi Decl., ¶ 27.)

**1.    Concialdi Requests Accommodations from Pagano Because of His Disability.**

In or around September of 2015, Concialdi requested an upgrade to business class from Pagano so that he could have more leg room for his bad leg on a long flight he had to take for an audit. (P71; JEX 37, p. 432, Concialdi Decl., ¶ 21.) Pagano said he had to get Berryman's approval for the request, and Concialdi had to follow up

with Pagano twice before his request was approved because Pagano was not getting back to him about it. (P72; *id.*) Concialdi also asked Pagano for time off work to get an MRI. (P73; JEX 30, p. 326.)

**2. Concialdi Believes Everyone Knows He Has a Disability.**

Concialdi knew that some of his co-workers had told others at Jacobs about his MS because people he had not told about his condition brought it up with him. (P74; Pl. Depo., 123:25-124:18.) He also believed Pagano and Dehamel were told about his MS by their predecessors, Plante and Nunnelly, because that was the proper protocol. (P75; *id.*)

**I. In January of 2016, Berryman Instructs Pagano to Eliminate a Current Position from the Internal Audit Department to Make Room for a Position in Europe.**

In January of 2016, Pagano and Berryman had a meeting in which Pagano stated that they had made the decision to add a position in Europe and stay with their current budget. (P76; Pagano Depo., 237:16-238:10.) Berryman told Pagano, ***"The only way you're going to hire somebody is if you remove somebody,"*** in essence communicating to Pagano that he needed to fire one of the current internal audit managers. (P77; Pagano, 237:16-238:10.)

**J. Pagano Gives Concialdi Poor Performance Review Scores and Uses Them as a Basis for Terminating Concialdi's Employment.**

Although the review period reflected on Concialdi's 2015 performance review was from October of 2014 through September of 2015, Pagano admits that he did not have a proper basis to review Concialdi and the others for the time the review was supposed to cover. (P78-79; JEX 12 pp. 219-226; Pagano Depo., 166:8-167:6, 257:22-25.) Pagano unilaterally changed the time so that he could write the 2015 reviews for the auditors. (P80; Pagano Depo., 166:8-167:6.) He then assigned Concialdi the lowest score on the team and used that score as a basis for terminating his employment instead of that of other members of the internal audit department.

(P81; JEX 14, pp. 231-234.)

**K.      Conciardi Believes His Complaints About Pagano's Unfair Treatment Resulted in His Low Review Scores.**

Conciardi complained about Pagano's behavior toward him to Burns and Evered. (P82-P83; Pl. Depo., 153:18-158:3; JEX 37, pp. 429-430, Conciardi Decl., ¶ 15 (Conciardi complained about Pagano's comments about his age and how he walked, his general behavior toward him, and how critical Pagano was of his work).) Conciardi believes his complaints may have gotten back to Pagano and played a role in Pagano's giving him lower performance scores than anyone else and terminating his employment. (P84; Pl. Depo., 154:5-9.)

**L.      Pagano Contradicts His Statement that He Was the Sole Decision-Maker in Conciardi's Employment Termination and Places the Decision on Senior Management.**

After Conciardi's employment was terminated, Pagano sent an e-mail inform-ing members of his team that "[Pagano] was asked to reduce one position" and that "Senior Management" wanted their team to be in line with the new structure, which eliminated Conciardi's position in Pasadena. (P85; JEX 31, p. 328.) However, Pagano testified that it was his *and* Berryman's decision to add a position in Europe and eliminate a current auditor's position, not that he was asked to do so. (P86; Pagano Depo., 235:10-238:16.)

**M.      At His Employment Termination Meeting, Pagano Informs Conciardi that His Employment Is Being Terminated Because There Is No Position in Pasadena.**

Pagano again contradicted himself in Conciardi's employment termination meeting on March 30, 2016, by telling Conciardi that he was being discharged be-cause his position in Pasadena was being eliminated and that Jacobs had a spot in Italy. (P87; Pl. Depo., 115:15-18; JEX 37, p. 434, Conciardi Decl., ¶ 29.)

**N.  The Budget Increases to Allow for Two Additional Auditors After Concialdi's Employment Is Terminated.**

According to Pagano, his budget in 2016 allowed for a total of only *seven* auditors. (P88; JEX 3, p. 153, Pagano Decl., ¶ 28.)  However, Pagano testified that by 2017 he had *nine* people in his group, including an individual hired in Scotland in March of 2017 to replace Concialdi. (P89; Pagano Depo., 82:19-83:2.)

**O.  Pagano's Poor Management Skills.**

Concialdi testified that he believed Jacobs committed wrongdoing by hiring Pagano and getting rid of Plante. (P90; Pl. Depo., 168:22-169:23.)  Plante was a good manager, and Pagano harassed and wrongfully discharged Concialdi. (P91-P92; *id.;* JEX 37, p. 434, Concialdi Decl., ¶ 31.)

**P.  Pagano Fails to Follow Defendant's Progressive Discipline Policy.**

Jacobs has a progressive discipline policy that was in effect while Pagano was Concialdi's manager. (P93; Sanchez Depo., 201:4-9.)   Pagano stated that placing Concialdi on a performance improvement plan when he had worked for him for only five or six months would have been a "Snap judgment," yet he contradicted himself by using Concialdi's performance review as the basis for his decision to terminate Concialdi's employment.  (P94-95; Pagano Depo., 272:10-22, 315:23-317:14 (fired Concialdi because he was the "weakest player" on his team at that time).)

**Q.  Defendant's Failure to Follow Policy and Issue Concialdi Annual Performance Reviews.**

Jacobs has a mandatory policy that all employees receive annual performance reviews. (P96; Pagano Depo., 122:17-25.)  Concialdi did not receive reviews every year, was a violation of Jacobs's policy. (P97; *id.;* JEX 37, pp. 428-429, Concialdi Decl., ¶¶ 10, 14.)

**R.  Defendant's Policy Is to Terminate Employment for Good Cause, and Pagano Admits that He Did Not Fire Concialdi for Cause.**

On the basis of his investigations of hotline calls for employees of defendants,

Concialdi understood that Jacobs's policy and practice was to terminate employment only for good cause. (P98; Pl. Depo., 162:7-13, 165:9-23, 167:5-13; JEX 37, p. 426, Concialdi Decl., ¶ 3.) Pagano admits that he did not terminate Concialdi's employment for cause. (P99; Pagano Depo., 94:15-21.)

**S.    Plante Is Forced to Resign After He Is Diagnosed with Cancer.**

Plante became sick with cancer in March of 2014. (P100; JEX 37, p. 429, Concialdi Decl., ¶ 13.) He had to undergo chemotherapy and left Jacobs in July of 2015. (P101; *id.*) Plante was not accommodated, but was forced to resign and remained on the payroll until December of 2015, when he was approximately in his late 50s. (P102; JEX 37, p. 428; *id.* at ¶ 11; Pl. Depo., 155:15-25.)

**T.    Concialdi Suffers from Ventricular Contraction, Psoriasis, Depression, Anxiety, and Loss of Sleep as a Result of the Wrongful Termination of His Employment.**

As a direct result of his employment termination and the resulting stress, Concialdi developed premature ventricular contraction, with which he was diagnosed in the spring of 2017. (P103; Pl. Depo., 171:22-173:18; JEX 37, p. 434, Concialdi Decl., ¶ 31.) He was also diagnosed with psoriasis in the summer of 2016. (*Id.*) When Pagano became his supervisor, Concialdi began to develop depression and anxiety, which became worse after he was fired and caused him not to sleep well. (P105; *id.*) During his employment, Concialdi experienced stress, and it made him anxious and nervous when he had to deal with Pagano's repeatedly asking him why he was walking funny and if it were his old age. (P106; Pl. Depo., 176:13-19; JEX 37, p. 430, Concialdi Decl., ¶¶ 16-17.) While Concialdi's sleep has improved since his employment was terminated, it continues to be an issue. (P107; Pl. Depo., 172:16-21; JEX 37, p. 430, Concialdi Decl., ¶ 31.)

## III.    LEGAL ARGUMENT[8]

### A.    (D) Plaintiff's Disability Discrimination Claim Fails as a Matter of Law.

The burden-shifting analysis established in *McDonnell–Douglas Corp. v. Green,* 411 U.S. 792 (1973) applies to FEHA cases alleging discrimination and retaliation. *Sada v. Robert F. Kennedy Med. Ctr.*, 56 Cal.App.4th 138, 155-156 (1997). The standard involves a three-step analysis: (1) plaintiff must establish a *prima facie* case of discrimination/retaliation; (2) the employer can then offer a legitimate, non-discriminatory reason for its actions; and (3) if the employer does so, then the burden shifts to the plaintiff to offer *substantial* evidence to prove that the stated reason is pretext. *Id.*

#### 1.    (D) Plaintiff Cannot Establish a *Prima Facie* Case.

To establish a *prima facie* case of disability discrimination, Plaintiff must demonstrate the following: (1) he has a disability; (2) he is a "qualified individual with a disability," meaning that he can perform the essential functions of his position with or without reasonable accommodation; (3) he suffered an adverse employment action; and (4) a causal connection exists between his disability and the adverse employment action. *Jensen v. Wells Fargo Bank*, 85 Cal.App.4th 245, 254 (2000).

##### a)    (D) Plaintiff Cannot Prove that Pagano Had Knowledge of his MS.

To be liable on a claim of disability discrimination, the employer must have actual knowledge of the employee's specific disability at the time of the adverse employment decision. *Pensinger v. Bowsmith, Inc.,* 60 Cal.App.4th 709, 712 (1998), *rev'd on other grounds*, *Colmenares v. Braemar Country Club, Inc.*, 29 Cal.4th 1019, 1031 (2003). "An adverse employment decision cannot be made 'because of' a disability, when the disability is not known to the employer." *Brundage v. Hahn*, 57 Cal.App.4th 228, 236-37 (1997). Evidence that a decision maker learned of a

---

[8] For this section, "(D)" denotes Defendant's argument and "(P)" denotes Plaintiff's argument.

disability after the decision to terminate had already been made is wholly irrelevant as to whether the decision maker acted with discriminatory animus. *Avila v. Cont'l Airlines, Inc.*, 165 Cal.App.4th 1237, 1251 (2008.)

Plaintiff admits and it is **undisputed** that Pagano – the only decision maker involved in the decision to terminate Concialdi – did not know of his MS until and **only after** he informed Conciadli that his job was being eliminated.  (UF D72; JEX 1, p. 28, 30 (Pl. Depo. 102:1-19; 104:9-19; JEX 3 (Pagano Decl. ¶ 32).)   Plaintiff therefore cannot establish a causal connection between the disclosure of his MS to Pagano and Pagano's decision for lay off.

To the extent Plaintiff may argue that other employees knew about his MS, such an assumption is insufficient to establish knowledge by the decision maker. *Avila, supra,* 165 Cal.App.4th at 1250 (no triable issue of fact when no evidence to establish that decision maker had gained knowledge of disability from others).

### b) (D) Plaintiff Cannot Establish A Causal Connection Between His Limp and Pagano's Decision.

First and foremost, Plaintiff cannot establish that Pagano had any knowledge of his limp at the time the termination decision was made in March 2016, let alone that the limp was related to some disability.  Plaintiff sent Pagano an e-mail on Nov. 25, 2015, indicating that his doctor "wants to see [him] in a month and says **I'll be fine by then**," (UF D89; pp. 34-35, 83 (Pl. Depo. 133:17-134:11; Ex. 16), and when Pagano saw Plaintiff during a return trip to the Pasadena office later in early 2016, he noticed that Plaintiff was in fact <u>not</u> walking with a limp. (UF D90; JEX 3, p. 154 (Pagano Decl. ¶ 33.)

> Q    Did you ever observe Mr. Concialdi walking without a limp?
> A    **After that?**
> Q    At any point in time.
> A    **Certainly before that and then some time after that, yeah, so I just assumed whatever he had done that that MRI and all that stuff took care of it.**
> (UF D93; JEX 2, p.134 (Pagano Depo. 207:19-25).)

The last time Pagano saw Concialdi prior to making the decision to terminate

his position, Concialdi was not walking with any sort of a limp (UF D90 and D91; JEX 3, p. 154-155 (Pagano Decl. ¶¶ 33, 34), and there is there no evidence that would impart knowledge of any limp onto Pagano after this point in time.

Regardless, even if it could be shown that Pagano knew of his limp at the time the decision was made, awareness of a physical condition, without more, does not establish that an employer regarded its employee as disabled. *See, e.g., Kelly v. Drexel University*, 94 F.3d 102, 109 (3d Cir. 1996) (holding that awareness of an employee's limp is not sufficient to show that employer regarded employee as disabled); *Davis v. Tammac Corp*., 127 F.Supp.2d 625, 631 (M.D. Pa. 2000) (awareness of an employee's heart condition is not sufficient to establish that the employee was regarded as disabled).  "While knowledge of the disability can be inferred from the circumstances, knowledge will only be imputed to the employer when the fact of disability is the *only* reasonable interpretation of the known facts." *Featherstone v. S. California Permanente Med. Grp*., 10 Cal.App.5th 1150, 1167 (2017) (citing *Brundage*, *supra,* 57 Cal.App.4th at 237) (original emphasis).

Here it is undisputed that Plaintiff: (1) never asked for any accommodation; (2) never used a cane or other assistive device while at work, (3) never requested medical leave, and (4) had no work restrictions or any known limitations that would have limited his ability to accomplish his job duties. (See UF D94 through D97.)

Therefore, it cannot be said that the "only reasonable interpretation" of these facts suggests that Pagano had to have known that the limp that Pagano last observed sometime in 2015 was actually a "disability."  In fact it would be **unreasonable** to infer knowledge of a disability given the fact that Plaintiff sent Pagano an e-mail in November 2015 stating that he would "be fine" in a month (UF D89; JEX 1, pp. 34-35, 83 (Pl. Depo. 133:17-134:11; Ex. 16)), and then Pagano observed Plaintiff walking *without* a limp a couple months later, (UF D90; JEX 3, p.154 (Pagano Decl. ¶ 33).  Under these conditions, no reasonable inference can be made that Pagano considered Plaintiff "disabled" at the time he made the decision to terminate him later

in March 2016.

## 2.   (D) Legitimate and Non-Discriminatory Reason for Termination.

A legitimate reason is facially unrelated to prohibited bias. G*uz v. Bechtel Nat'l, Inc*., 24 Cal.4th 317, 358 (2000).  The reasons need not be wise or necessarily correct business decisions, but the question is simply whether the employer honestly believed its reasons for its actions. *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1063 (9th Cir. 2002).

Here, Plaintiff's job was eliminated because Jacobs made the decision to restructure its Internal Audit department and hire an auditor in Europe. (UF D61, D62; JEX 3, p.147 (Pagano Decl. ¶ 7); JEX 13, p. 229 (Berryman Decl. ¶ 5.)  At the time the decision was made Pagano was constrained by his budget that allowed for seven (7) total auditors, which he already had at that time. (UF D63; JEX 3, p.148 (Pagano Decl. ¶8); JEX 13, p. 230 (Berryman Decl. ¶6.)  Therefore Pagano selected Plaintiff for the job elimination because he was the lowest performing auditor, as set forth above in detail in the Statement of Facts, Section II(C) and (D).[9]

## 3.   (D) Plaintiff Cannot Establish That Jacobs' Reason Was Pretext.

Plaintiff bears the burden of proving that the employer's proffered reasons for the adverse employment action were pretextual. *Caldwell v. Paramount Unified School Dist.*, 41 Cal.App.4th, 189 196–197 (1995). If the plaintiff relies on circumstantial evidence to establish pretext, it must be "specific and substantial in order to create a triable issue with respect to whether the employer intended to discriminate on an improper basis." *Morgan v. The Regents of the University of California*, 88 Cal.App.4th 52, 69 (2000); *see also Hersant v. Department of Social Services*, 57 Cal.App.4th 997, 1005 (1997).  An employee cannot create a genuine issue of pretext to survive a motion for summary judgment by relying solely on unsupported speculations and allegations of discriminatory intent. *Harper v.*

---

[9] Due to page limitations, Defendant respectfully refers the Court to the Statement of Facts, sections II(C) and (D) in support of Defendant's legitimate, non-discriminatory reason to eliminate Plaintiff's position.

1    *Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989).

2         Here, Plaintiff cannot show the required "weaknesses, implausibilities,

3    inconsistencies, incoherencies, or contradictions" in Jacobs' legitimate, non-

4    discriminatory reason for his termination. *Hersant,* 57 Cal.App.4th at 1005.  Pagano

5    had ample justification to select Concialdi as his weakest performer, as explained

6    above in Sections II(C) and (D).

7    **B.    (P) Direct and Indirect Evidence Negates Summary Adjudication.**

8         With *direct* evidence of discrimination, there is no need for inferences,

9    presumptions, or shifting burdens, rendering unnecessary the test set forth in

10   *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *O'Mary v. Mitsubishi*

11   *Electronics America, Inc.,* 59 Cal.App.4th 563 (1997); *Morgan v. Regents of the*

12   *University of California,* 88 Cal.App.4th 52, 69-70 (2001); *Godwin v. Hunt Wesson,*

13   *Inc.,* 150 F.3d 1217, 1221 (9th Cir. 1998).

14        Additionally, *Reid v. Google,* 50 Cal.4th 512, 540 (2010), requires a trial court

15   to review and base its summary judgment ruling on the totality of evidence in the

16   record, including *any* relevant discriminatory remark. While a single comment may

17   not create a triable issue, "combined with other evidence of pretext, an otherwise

18   stray remark may create an 'ensemble [that] *is* sufficient to defeat summary

19   judgment.'" *Id.* at 542 (emphasis in original).  A trial court that does not consider such

20   comments fails "to draw all reasonable inferences in favor of the plaintiff." *Id.*

21   Accordingly, *Reid* held, "[E]ven if age-related comments can be considered stray

22   remarks because they were not made in the direct context of the decisional process, a

23   court should not categorically discount the evidence if relevant; it should be left to the

24   *fact finder* to assess its probative value." *Id.* at 540 (emphasis added).  "Determining the

25   weight of discriminatory or ambiguous remarks is a role reserved for the jury." *Id.* at

26   541. In sum, *Reid* held that trial courts must consider "evidence of alleged discriminatory

27   comments made by decision makers and co-workers, along with all other evidence in the

28   record." *Id.* at 545.

Pagano, who was directly involved in the employment termination decision, subjected Concialdi to demeaning and offensive comments regarding his age and disability. (JEX 37, p. 430, Concialdi Decl., ¶ 16.)  The weight of the discriminatory remarks and the fact of discrimination should be left to the trier of fact.

**C.    (P) Concialdi Makes a *Prima Facie* Showing of Discrimination, Including that Defendant And Pagano *Perceived* His Disability.**

Plaintiff makes a *prima facie* showing of discrimination under the Fair Employment and Housing Act ("FEHA "), as he (1) was a member of protected classes, as he was over the age of 40 and had MS, which caused him to walk slowly and with a limp; (2) was qualified for his job, as is clearly shown by his exemplary work history (including Pagano's admission that he a good auditor), and (3) and was fired. *Mixon v. Fair Employment & Housing Com.,* 192 Cal.App.3d 1306, 1318 (1987); Government Code §§ 12940, 12926(m); *Yanowitz v. L'Oreal USA, Inc.,* 36 Cal.4th 1028, 1053-1054 (2005).

FEHA protects "any individual ***regarded*** or treated by an employer as having, or having had, ***any physical condition that makes achievement of a major life activity difficult*** or may do so in the future." *Gelfo v. Lockheed Martin Corp.* 140 Cal.App.4th 34, 53 (2006) (emphasis added).  Specific knowledge of the condition is not required for protection under FEHA. *Id.*  **Walking is a major life activity**. *Sandell v. Taylor-Listug, Inc.,* 188 Cal.App.4thh 297, 311 (2010). Concialdi had great difficulty walking; he walked slow and with a limp, which Pagano regularly commented on. (P40; JEX 37, p. 430, Concialdi Decl., ¶ 16.)

An employer knows an employee has a disability when the employee tells the employer about his condition **or when the employer otherwise becomes aware of the condition, such as through a third party or by underline observation**. *Soria v. Univision Radio Los Angeles, Inc.,* 5 Cal.App.5th 570, 592 (2016).  A ***perception*** that a person has a disability is sufficient for a claim of discrimination. *Rope v. Auto-Chlor System of Washington Inc.,* 220 Cal.App.4th 635, 655 (2013).

1.    **(P) The Decision Makers' Animus Against Concialdi's Perceived Disability Supports the Disability Discrimination claim.**

Remarks made by decisionmakers about an employee's disability, perceived or actual, similarly evidence disability discrimination. *Sandell, supra,* 188 Cal.App.4th at 319-320; *Reid, supra,* 50 Cal.4th at 539.  Pagano made remarks about why Concialdi walked slowly and with a limp throughout the entirety of his employment. (P40; JEX 37, p. 430, Concialdi Decl., ¶ 16.) These comments demonstrate both a perception of Concialdi being disabled and discriminatory motive. *Id.*

2.    **(P) The Disputed Facts Demonstrate that Defendant and Pagano Had Knowledge of His Disability.**

As a result of his relapse, Concialdi has walked slowly and with a noticeable limp since January of 2013. (P27-P29; JEX 37, pp. 428-429, Concialdi Decl., ¶ 12.) There is no way Pagano observed Concialdi walking without a limp after November of 2015 because Concialdi has always had a limp since 2013. (*Id.*)  Also, on nearly every occasion they saw each other, Pagano made offensive remarks to Concialdi about his age and the way he walked, from July of 2015 through March of 2016. (P40; Pl. Depo., 132:14-133:1, JEX 37, p. 430, Concialdi Decl., ¶ 16.) Contrary to Pagano's statements, Concialdi confirms that Pagano continued to make these remarks to him beyond November of 2015. (*Id.*) Pagano is hard pressed to deny knowledge that Concialdi had a disability because Concialdi even requested accommodations from Pagano. (P72-73; JEX 30, p. 326; JEX 37, p. 432, Concialdi Decl., ¶ 21.)

Berryman and Dehamel also observed Concialdi walking slowly and limping, and Dehamel inquired about it. (P68-69; Dehamel Depo., 126:22-127:24; JEX, pp. 433-434, Concialdi Decl., ¶¶ 27-28.)  It is disputed that Pagano was the only decision-maker, and, at the least, Berryman was another decision-maker. **On the basis of their observations of Concialdi's walking, Pagano and defendant had knowledge that Concialdi was disabled.**  Concialdi also informed human resources

31

in 2015 that he was disabled, and he believes Plante and Nunnelly also told Pagano and Dehamel about his MS. (P64, P75; Pl. Depo., 123:25-124:18, 125:19-126:24.) Thus, there was knowledge of Concialdi's disability.

**3.** **(P) The Disputed Facts Demonstrate a Causal Connection Between Concialdi's Disability and Pagano's Discharge Decision.**

First, there is no requirement that a causal connection between the disability and the adverse employment action be proven by direct evidence. *Jensen v. Wells Fargo Bank,* 85 Cal.App.4th 245, 254 (2000). This element can be established by showing that the plaintiff was subjected to an adverse employment action and that he or she was replaced by a non-disabled person or was treated less favorably than non-disabled employees. *Id.* (*See* Section D below for pretext argument.) Defendant first argues that Pagano had no knowledge of Concialdi's MS, but this is irrelevant because **Pagano's perception that Concialdi was disabled is all that is required.** *Rope v. Auto-Chlor Systen of Washington Inc., supra,* 220 Cal.App.4th at 655, *Soria v. Univision Radio Los Angeles, Inc., supra,* 5 Cal.App.5th at 592. Defendant's allegation that Pagano never saw Concialdi walk slowly or with a limp after November of 2015 is completely and utterly false. Concialdi's condition never got better after his 2012 relapse; he never stopped walking slowly and with a limp. (P27; JEX, 37, pp. 428-429; Concialdi Decl., ¶ 12.) Radacina even stated that a **person would have to be blind not to see that Concialdi had physical impairment from the way he walked.** (P31; JEX 32, p. 330, Radacina Decl., ¶ 3.)

Second, defendant incorrectly asserts that it is undisputed that Concialdi never asked for accommodations—that fact is very much disputed. (*See* P73; JEX 30, p. 326; JEX 37, p. 432, Concialdi Decl., ¶ 21.) Concialdi asked for time off to go to the doctor on many occasions and had to take PTO. (*Id.*) His job required him to travel to conduct audits, and traveling became much more difficult for him as a result of his difficulty with his leg. (P17; JEX 37, pp. 426-427, Concialdi Decl., ¶ 5.) Hence, Concialdi requested accommodation of an upgrade to business class for more leg

room. (P71; JEX 37, p. 432, Concialdi Decl., ¶ 21.) The **only** reasonable inference that can be drawn from the facts is that Pagano knew that Concialdi had a disability.

**D.      (P) A Plethora of Evidence Demonstrating Pretext Negates Summary Judgment in Its Entirety.**

"[O]nce the employer's justification [for employment termination] has been eliminated, discrimination may well be the most likely alternative explanation." *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 147 (2000) *A party's dishonesty about a material fact may be viewed as "affirmative evidence of guilt." Ibid.* (emphasis added).  Here, there is overwhelming evidence of pretext.

**1.      (P) Defendant's Entire Motion Rests on False Testimony, Negating Summary Judgment.**

Defendant's motion is supported substantially by Pagano's false and inconsistent testimony, warranting complete denial of summary judgment.  Code of Civil Procedure § 437c(e) ("summary judgment may be denied in the discretion of the court . . . where a material fact is an individual's state of mind, or lack thereof, and that fact is sought to be established solely by the individual's affirmation thereof"); *People v. Mendoza,* 192 Cal.App.3d 667 (1987) (false statements "suggest there is no honest explanation for the incriminating circumstances").

Pagano states that the employment termination decision was solely his, but then sent out an e-mail announcing Concialdi's firing and removed himself from any affiliation with the decision in the e-mail. (P85; JEX 31, p. 328, Pagano Depo., 235:10-238:16.)  Defendant's purported budget issues are also false because a year after Concialdi's employment was terminated the budget was increased to allow for not one, but two, additional positions in the department. (P89; JEX 3, p. 153, Pagano Decl., ¶ 28; Pagano Depo., 82:19-83:2.)  Concialdi's replacement was not hired until March of 2017—one year after Concialdi was fired. (P89; Pagano Depo., 243:13-18.) This replacement was based in Scotland, not Italy, and was not disabled. (*Id.;* P14; Sanchez Depo., 143:8-22.)

**2.    (P) Defendant's False Stated Reasons for Firing Concialdi Are "Unworthy of Credence" and Negate Summary Adjudication.**

Evidence that Jacobs's claimed reasons for firing Concialdi are "unworthy of credence" is probative of pretext and retaliation. *Reeves v. Sanderson Plumbing, supra,* 530 U.S. 133.  "Proof that the employer's proffered reasons are unworthy of credence may 'considerably assist' a circumstantial case of discrimination, because it suggests the employer had cause to hide its true reasons." *Guz v. Bechtel Nat'l, Inc.,* 24 Cal.4th 317, 361 (2000); *Nazir v. United Air Lines,* 178 Cal.App.4th 243, 277-283 (2009).  Defendant's stated reason for firing Concialdi is that Pagano gave him the lowest performance scores in his group, yet Pagano testified that he did not have a proper basis to evaluate anyone for the 2015 performance review period. (P95; Pagano Depo., 272:10-22.)  Furthermore, Pagano told Concialdi in his employment termination meeting that there was a position open in Italy, not in Pasadena, and that was why he was being let go. (P87; Pl. Depo., 115:15-18; JEX 37, p. 434, Concialdi Decl., ¶ 29.) However, the position filled was in Scotland. (P14; Sanchez Depo., 143:8-22.)

**3.    (P) Subjective Performance Criticism Is Susceptible to Discriminatory Abuse and Can Demonstrate Pretext.**

Subjective practices are particularly susceptible to discriminatory abuse and should be closely scrutinized. *Jauregui v. City of Glendale,* 852 F.2d 1128, 1136 (9th Cir. 1988).  Pagano's discretion as to what scores to assign his group when he knew he was going to use them to fire someone bolsters a finding that he exercised discriminatory abuse in assigning those scores and wrongfully terminating Concialdi's employment.

**4.    (P) Deviating from Policies and Practices for Concialdi Is Evidence of Pretext.**

A defendant's failure to honor its own policies and procedures in its treatment of the plaintiff constitutes evidence of pretext. *Village of Arlington Heights v. Met.*

1   *Hous. Dev. Corp.,* 429 U.S. 252, 267 (1977).   Here, defendant utterly failed to

2   provide Concialdi with mandatory annual performance reviews, required by its

3   policy. (P97; Pagano Depo., 122:17-25; JEX 37, pp. 428-429, Concialdi Decl., ¶¶ 10,

4   14.) Furthermore, Pagano failed to follow defendant's progressive disciplinary policy

5   for Concialdi's alleged performance issues. (P93-P95; Pagano Depo., 272:10-22.)

**5.    (P) A Work Culture Tolerating Bias Proves Pretext.**

7       Evidence showing a work culture of retaliatory bias proves pretext. *See*

8   *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 356 (3rd Cir. 1998)

9   ("circumstantial evidence establishing the existence of a discriminatory atmosphere at

10  the defendant's work place in turn may serve as circumstantial evidence of

11  individualized discrimination directed at the plaintiff"); *Cummings v. The Standard*

12  *Register Co.,* 265 F.3d 56 (1st Cir. 2001) (evidence of a discriminatory "atmosphere"

13  at the work place is relevant to showing "corporate state of mind").  Plante, who was

14  in his late 50s and was diagnosed with cancer, was not accommodated and was forced

15  to resign a year after his diagnosis. (P102; JEX 37, p. 428, Concialdi Decl., ¶¶ 11, 13;

16  Pl. Depo., 155:15-25.)

**6.    (P) Biased Remarks Create an Inference of Pretext.**

18      Biased remarks, regardless of how potentially benign, evince pretext.

19  *Ercegovich, supra,* 154 F.3d at 355; *Reid, supra,* 50 Cal.4th at 540; *Pantoja v. Anton,*

20  198 Cal.App.4th 87, 119 (2011); *O'Mary, supra,* 59 Cal.App.4th at 575.  Pagano

21  made nearly weekly remarks about Concialdi's old age and the way he walked from

22  July until December of 2015 and continued to make these remarks when he saw

23  Concialdi until his discharge, in March of 2016. (P40; Pl. Depo., 132:14-133:1,

24  139:21-141:12, 142:13-18, 144:13-146:13; JEX 37, pp. 430-431, Concialdi Decl.,

25  ¶¶ 16-19.)

**E.    (P) Defendants Are Liable Under the "Cat's Paw" Liability Theory.**

27      Berryman's and senior management's role in the decision-making process will

28  allow a jury to find defendants liable for the discriminatory conduct.  "If a supervisor

makes another his tool for carrying out a discriminatory action, the original actor's purpose will be imputed to the tool, or through the tool to their common employer." *Reeves v. Safeway Stores, Inc.,* 121 Cal.App.4th 95, 113, 116 (2004).  Pagano testified that Berryman told him he needed to eliminate a current position in his department. (P77; Pagano, 237:16-238:10.)    Furthermore, Pagano sent an e-mail pinning the employment termination decision on senior management. (P85; JEX 31, p. 328.) Whether or not Berryman or others responsible as decision-makers harbored illegal intent here is irrelevant. *DeJung v. Superior Court,* 169 Cal.App.4th 533 (2008); *Staub v. Proctor Hospital,* 131 S.Ct. 1186 (2011). "A showing that a significant participant in an employment decision exhibited discriminatory animus is enough to raise an inference that the employment decision itself was discriminatory, even absent evidence that others in the process harbored such animus." *DeJung* at 533; *Reeves v. Safeway* at 113.

### F.    (D) Plaintiff's Age Discrimination Claim Fails as a Matter of Law.

Age discrimination claims follow the *McDonnell Douglas* burden-shifting analysis. *Guz v. Bechtel Nat. Inc.*, 24 Cal.4th 317, 355 (2000).  To establish a *prima facie* case of age discrimination, Plaintiff must present evidence that: (1) he was a member of a protected class; (2) he was performing competently in the position he held; (3) he suffered an adverse employment action; and (4) specific facts suggest age-based discriminatory animus. *Id.* Stray remarks alone are insufficient to demonstrate discriminatory animus. *Nidds v. Schindler Elevator Corp*., 113 F.3d 912, 919 (9th Cir. 1996) (isolated "old timers" comment not enough to create an inference of age discrimination).  Plaintiff cannot establish a *prima facie* case because there are no specific facts suggesting age-based discrimination.

Here, Concialdi's entire age claim is premised on a few stray comments. Concialdi claims that Pagano's November 2015 email with the phrase "men of a certain age" is evidence of age discrimination. (UF D102, JEX 1, p. 38-40, 83 (Pl. Depo. 139:21-141:12; Ex. 16).)  However, this was made in response to Plaintiff first

e-mailing Pagano regarding physical therapy on his knee, to which Pagano replied that he was getting physical therapy as well: "Good news. I had PT on my back. Men of a certain age!" (UF D101, *Id.* at p. 83 (Ex.16).)  Pagano is about two years older than Concialdi (UF D103; JEX 2, p. 129-30 (Pagano Depo. 177:24-178:8)), and there is no evidence that this was anything more than a normal exchange between co-workers of similar age who were both having physical therapy.[10]  There also is no evidence that the comment had any connection with Pagano selecting Concialdi for job elimination some four months later.

In fact, Concialdi admits that the comment from Pagano meant "*we're [both]* getting older. You are becoming an old man *like me*. That's the way I read it." (UF D106; JEX 1, p. 40 (Pl. Depo. 141:3-12). Concialdi later stated "**So what if [Edd was kidding]**, it's still an age-related comment"—showing that he knew that the statement made by Pagano held no discriminatory animus. (UF D107; *Id.*)

Concialdi also states that comments surrounding "walking slowly" were age-based. (UF D108, JEX 1, pp. 38-40 (Pl. Depo. 139:21-141:12).)  However, even if such a comment was made, Pagano made the comment in response to his observation of Plaintiff's physical walking, not because of his age. (UF D109; JEX 1, pp. 38-39 (Pl. Depo. 139:21-140:2.)  Furthermore, even if one could consider these comments to be age-based, such stray remarks are insufficient to establish discriminatory animus. *Nesbit v. Pepsico, Inc*., 994 F.2d 703, 705 (9th Cir. 1993) (comment that "[w]e don't necessarily like grey hair," and "[w]e don't want unpromotable fifty-year olds" to be weak evidence when made in an ambivalent manner not directly tied to the employee's termination).

Finally, even if Plaintiff could establish a prima facie case, Jacobs had a legitimate, non-discriminatory reason for his termination and he cannot show pretext.

---

[10] The age of the internal auditors during the relevant time period under Pagano's supervision were between the ages of 54-60 years old. (UF D104**;** JEX 20, p. 259 (Heather Sanchez Depo. 188:3-10).) Concialdi was born on March 8, 1959,(UF D105; JEX 1, p. 6 (Pl. Depo. 22:3-4), placing him in the middle of the group of internal auditors (57 years old) at the time of termination.

**G.     (P) Defendant's Conduct Was Premised on Both Concialdi's Age and His Disability, Thus, the Age Discrimination Claim Must Also Survive.**

As was discussed above, there is direct evidence of age discrimination.  Here, Pagano not only orally made remarks about "old age" to Concialdi, but he stated it in an e-mail to Concialdi. (P41; JEX 29, p. 324; JEX 37, p. 430, Concialdi Decl., ¶ 16.) Regardless, plaintiff makes a *prima facie* showing of age discrimination. (*See* Section C above.)  Defendant also incorrectly asserts a fourth element of establishing a *prima facie* case of age discrimination, indicating that specific facts suggesting animus are required. Rather, direct evidence, combined with pretext, is sufficient to defeat summary judgment. *Reid v. Google, supra,* 50 Cal.4th at 540.

**H.     (D) Plaintiff's Harassment Claims (COA No. 2 & 5) Fail under the Law.**

To prevail on a harassment claim under FEHA, an employee must show that he was subjected to verbal or physical conduct related to a protected trait, that the conduct was unwelcome, and that the conduct was sufficiently severe or pervasive to create an abusive work environment.  *Reno v. Baird*, 18 Cal.4th 640, 646–47 (1998). "Offhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms or conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Here, the conduct Plaintiff asserts as harassing is not sufficiently severe or pervasive which would create an abusive work environment. First, Edd Pagano, the individual who Plaintiff claims created the abuse in conclusory fashion, was described by Plaintiff as a "typical manager" and he actually got along with him. (UF D18 and D19; JEX 1, p. 14 (Pl. Depo. 38:2-14).)  Second, the purported harassing conduct was limited to Pagano inquiring about his walking: Why are you walking that way? Is there something wrong with your leg? Something wrong with your foot? (UF D110; JEX1, pp. 41, 43 (Pl. Depo. 144:13-19; 146:1-6).)   Such comments are not threatening, humiliating, or sufficiently severe to create an abusive environment.

1    Instead, Plaintiff asserts that Pagano's comments only caused him a "***little bit*** of

2    stress." (UF D111; JEX 1, p. 60 (Pl. Depo.176:13-19).)  And finally, Conciardi admits

3    this alleged harassment (consisting of comments about his walk) only occurred

4    between July and November 2015 (UF D85; JEX 1, p. 41-42 (Pl. Depo. 144:13-

5    145:7), did not occur often (UF D84; *Id.*), and then only occurred at <u>most</u> once a week

6    (UF D86; JEX 1, p. 43 (Pl. Depo. 146:7-13).

7    **I.    (P) The Age and Disability Harassment Claims Survive Summary**

8       **Adjudication.**

9       An employer is liable under FEHA for harassment because of an employee's

10   age or disability (among other things) when "the entity, or its agents or supervisors,

11   knows or should have known of [the harassment] and fail[s] to take immediate and

12   appropriate corrective action." Government Code § 12940(j)(1).  Whether conduct is

13   harassing is "usually a question of fact" for the jury. *Harris v. Forklift Systems,* 510

14   U.S. 17, 23 (1993). An employer is strictly liable for its supervisors' actions. *Myers v.*

15   *Trendwest Resorts,* 148 Cal.App.4th 1403, 1421 (2007).  The law provides that even a

16   single offensive act or comment by a supervisor is sufficient for liability. *Dee v.*

17   *Vintage Petroleum,* 106 Cal.App.4th 30, 36 (2003).  A hostile work environment is

18   established upon a showing of a work place atmosphere permeated with

19   discriminatory insult and ridicule.  *Brennan v. Townsend & O'Leary Enterprises,* 199

20   Cal.App.4th 1336, 1352 (2011).

21      Conciardi's evidence establishes that the harassment made him extremely un-

22   comfortable at work until his employment was terminated, causing him severe emo-

23   tional distress. (P104-107; JEX 37, p. 430, Conciardi Decl., ¶¶ 16-17.)  Throughout

24   his employment, Conciardi was forced to battle repeated inappropriate and unprofes-

25   sional digs and comments by his supervisors, specifically Pagano, about his old age

26   and his slow walk and limp, **as often as once a week.** (P40-42; Pl. Depo., 144:13-

27   146:13.)  Conciardi told Pagano, **his supervisor,** he had a bad leg and a torn meniscus

28   and even e-mailed Pagano about his doctor's diagnosis so that he would stop

1  commenting on his "old age" and his walk—but Pagano continued making these

2  comments until Concialdi was fired. (P42; JEX 29, p. 324, Pl. Depo., 144:13-146:13;

3  JEX 37, pp. 430-431, Concialdi Decl., ¶¶ 16-19.)  As a result, the harassment claims

4  must survive.

5      **J.      (D) Plaintiff's Retaliation Claims (COA Nos. 3 &6) Fail Under the Law.**

6          To establish a prima facie case of retaliation, Plaintiff must show that he

7  (1) engaged in a protected activity; (2) suffered an adverse employment act; and (3) a

8  causal link between the two. *Yanowitz v. L'Oreal USA Inc*. (2005) 36 Cal.4th 1028,

9  1052–56.  Protected activity is where the employee has a reasonable belief that he

10  opposed activity that constituted unlawful discrimination, or exercised a right or

11  privilege under the law. *Yanowitz v. L'Oreal USA, Inc*., 36 Cal.4th 1028, 1047,

12  (2005); Cal. Gov. Code § 12940(h).

13         Plaintiff admitted that retaliation is "when you report something, and then you

14  are retaliated against… If that's the definition of retaliation, **I don't think there is**

15  **any**." (UF D112; JEX 1, p. 46 (Pl. Depo. 151:9-18).)  He then confirmed he never

16  submitted a complaint either orally or written to anyone at Jacobs. (UF D99; JEX 1,

17  pp. 47-48 (Pl. Depo. 152:10-153:4).)  Plaintiff then went on to claim that he "vented"

18  to his co-workers (Peggy and Louise, neither of which are supervisors), and **if** that got

19  back to Pagano that could be retaliation. (UF D100; JEX 1, p. 48-49 (Pl. Depo.

20  153:18-154:9).)  However, Plaintiff also admits that he can't remember what he even

21  complained to them about. (UF D113; JEX 1, p. 53 (Pl. Depo. 158:4-7).)

22         First and foremost, Concialdi cannot even remember what he vented to Louise

23  and Peggy about, and therefore there is no action upon which to evaluate whether

24  protected activity occurred to begin with.  Even assuming he did vent about Pagano,

25  general complaints about a supervisor's actions are not considered protected

26  activities. *Yanowitz v. L'Oreal*, 36 Cal.4th at 1047 (complaints about personal

27  grievances or vague or conclusory remarks is not protected activity).  Finally, there is

28  no evidence that Pagano was even aware of these alleged discussions, let alone the

content of the discussions.  This is especially so given that Pagano was in Houston, Texas for at least the last three months prior to Plaintiff's termination date, while Concialdi remained in Pasadena.  Therefore Plaintiff cannot establish any causal connection between the venting sessions and his termination.

Concialdi also claims that Pagano giving him "low evaluation scores" was a retaliatory act. (UF D114; JEX 1, pp. 50-52 (Pl. Depo. 155:1-157:23).)  However again he cannot prove he engaged in any protected activity, let alone how his low evaluation scores were casually connected to any alleged protected activity.  Finally, even if Plaintiff was able to establish a prima facie case of retaliation, Jacobs had a legitimate, non-retaliatory reason for his termination and Plaintiff cannot show pretext. *Addy v. Bliss & Glennon* (1996) 44 Cal.App.4th 205, 215.

**K.**   **(P) Plaintiff Makes a *Prima Facie* Showing of Retaliation.**

"Retaliation claims are inherently fact-specific, and the impact of an employer's action in a particular case must be evaluated in context.  When adverse employment decisions are taken within a reasonable time after an employee engages in protected activity, causation may be inferred." *Flait v. North American Watch Corp.,* 3 Cal.App.4th 467, 479 (1992).  Such "timing of events" is one type of circumstantial evidence that can prove causation. *Colarossi v. Coty US Inc.,* 97 Cal.App.4th 1142, 1153 (2002).  Concialdi believes that his complaints to his co-workers in late 2015 about Pagano's unfair treatment of him got back to Pagano and contributed to his decision to give Concialdi lower review scores in March of 2016 and ultimately terminate his employment in 2016. (P84; Pl. Depo., 154:5-9.)

**L.**   **(D) Plaintiff's Failure to Provide Reasonable Accommodation and Failure to Engage in Interactive Process Claims Fail.**

Under the FEHA, it is illegal to (1) "fail to make reasonable accommodation for the known physical ... disability of an applicant or employee," unless the accommodation is shown to produce undue hardship to the employer's operation, and (2) "to fail to engage in a timely, good faith, interactive process with the employee ...

to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee ... with a known physical ... disability." Cal. Gov. Code, § 12940, subd. (m) and (n).

The employee must request an accommodation from the employer; no duty to accommodate arises unless the employer has knowledge of a disability. *Avila v. Cont'l Airlines, Inc.*, 165 Cal.App.4th 1237, 1252 (2008) (citations omitted). "[T]he employee can't expect the employer to read his mind and know he secretly wanted a particular accommodation and sue the employer for not providing it." *Avila*, 165 Cal.App.4th at 1252-53 (citations omitted).  The duty to accommodate only arises "once an employee has brought to its attention his or her **inability to perform a particular job** function due to a covered disability." *Jensen v. Wells Fargo Bank* (2000) 85 Cal.App.4th 245, 260 (quoting *Barnett v. US. Air, Inc.,* 228 F.3d 110 (9th Cir. 2000).

Here, the undisputed facts show that Plaintiff never requested an accommodation for any disability, never requested medical leave, and never submitted any documentation concerning any disability or work restrictions. (UF D94-97.)  Plaintiff's MS did not keep him from performing his duties, and in fact Plaintiff himself states that throughout his employment he performed his duties in an "exemplary manner" (UF D115; JEX 21, p. 267 (Compl. ¶ 9), despite being diagnosed with MS.  Plaintiff also admits that had he needed to apply for disability he would have done so prior to being informed of the termination, but never needed to. (UF D116, JEX 1, p. 37 (Pl. Depo. 137:16-25).)

Similarly, an employer is required to initiate the interactive process only when an employee is unable to make such a request <u>and</u> employer knows of employee's disability. *Brown v. Lucky Stores, Inc.,* 246 F.3d 1182, 1188 (9th Cir.2001).  Plaintiff chose to not disclose his MS to Pagano, and cannot now expect Pagano to read his mind and know he secretly wanted a particular accommodation and then sue Jacobs for not providing this unarticulated request. *Avila*, 165 Cal.App.4th at 1252.

**M.    (P) Defendant Failed to Accommodate Concialdi.**

Government Code section 12940(m) makes it an unlawful employment practice "[f]or an employer or other entity covered by this part to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee."   There is no requirement that plaintiff prove an adverse employment action caused by the disability. *Jensen v. Wells Fargo Bank, supra,* 85 Cal.App.4th at 260. FEHA requires employers to be flexible and to work with disabled employees to accommodate their needs. *Prilliman v. United Airlines, Inc.,* 53 Cal.App.4th 935, 953 (1997).  Here, Concialdi was never told he could work from home, like other auditors, and was required to take paid time off for his disability. (P35; Pl. Depo., 127:8-128:20; JEX 37, pp. 428-429, Concialdi Decl., ¶ 12.)

**N.    (P) Defendant's Blatant Failure to Engage in the Interactive Process and Instruction for Concialdi to Keep His Diagnosis to Himself.**

Although an employee must request an accommodation before the parties engage in the process, he does not have to use any particular word, nor need the employer know the name or diagnosis of the employee's disability. *Gelfo v. Lockheed Martin Corp.,* 140 Cal.App.4th 34, 34, fn. 22 (2006); *Zivkovic v. Southern California Edison Co.,* 302 F.3d 1080, 1089 (9th Cir. 2002). The employer need know only that the employee has a medical condition or disability that requires accommodation.  If the process fails, responsibility for failure is with the party who failed to participate in good faith.  *Id.*  First, it must be noted that, when Concialdi informed Nunnelly in human resources of his MS, for unknown reasons she improperly advised him not to tell anyone about his diagnosis. (P22; Pl. Depo., 111:12-112:7, 127:10-17; JEX 37 p. 427, Concialdi Decl., ¶ 7.)  Second, when Concialdi requested time off from Plante and Pagano to go to the doctor or because he was ill, neither had any discussion with him about whether or not he could take medical leave. (P35; Pl. Depo., 127:8-128:20.)

### O.  (D) Plaintiff's Wrongful Termination Claim Fails.

Due to the similarity between statutory claims for discrimination or retaliation, and common law claims for wrongful termination in violation of public policy, both state and federal courts have held that when summary judgment is appropriate for the statutory claim, it is automatically appropriate for the common law wrongful termination claim. *Artega v. Brink's, Inc*., 163 Cal.App.4th 327, 355 (2008); *Hanson v. Lucky Stores, Inc*., 74 Cal.App.4th 215, 229 (1999); *Johnson v. Hertz Local Edition Corp.,* 2004 WL 2496164, *6 (N.D. Cal. Nov. 3, 2004). Therefore, Plaintiff's wrongful discharge in violation of public policy claim should be dismissed for the reasons set forth above and incorporated by necessity herewith.

### P.  (P) The Wrongful Employment Termination Claim Is Encompassed In the Arguments for Discrimination and Retaliation.

The wrongful employment termination claim should survive for the reasons set forth above pertaining to plaintiff's discrimination and retaliation claims.

### Q.  (D) Plaintiff's Breach of Contract Claims (express oral contract and implied-in-fact contract not to terminate without good cause) Fail as a Matter of Law.

At-will employment is presumed in California. *Guz v. Bechtel Nat'l, Inc.* (2000) 24 Cal.4th 317, 335; Lab. Code § 2922.  Plaintiff additionally acknowledged that his employment at Jacobs was at-will by signing his Employee Acceptance Statement. (UF D5; JEX 1, pp. 58-59, 73-75 (Pl. Depo. 166:6-167:4; Ex. 2.)  Plaintiff admits he knows of no policy at Jacobs that would require termination only for good cause (UF D6; JEX 1, p. 59 (Pl. Depo. 167:16-20), nor was he told of any oral contract to terminate him only for good cause (UF D117; JEX 1, pp. 57-58 (Pl. Depo. 165:9-166:2).

Furthermore, any alleged oral promise to terminate only "for cause" will not create any triable issue of fact, for the Parole Evidence rule forbids the consideration of extrinsic evidence following a signed agreement of the parties: "Although proof of

an implied-in-fact contract can overcome the statutory presumption of at-will employment, it cannot overcome an at-will provision in an express written agreement, signed by the employee." *Starzynski v. Capital Public Radio, Inc*. 88 Cal.App.4th 33, 37-38 (2001).

Furthermore, on the implied contract claim, California law is clear: An employment relationship with no specified term is presumptively "at-will;" both the employee and the employer are free to terminate the relationship at any time, with or without cause.  Cal. Lab. Code § 2922; *Foley v. Interactive Data Corp*., 47 Cal.3d 654, 677 (1988).  When dealing with an "at-will" employee, an "employer may act peremptorily, arbitrarily, or inconsistently [in terminating the employee], without providing specific protections such as prior warning, fair procedures, objective evaluation, or preferential reassignment." *Guz v. Bechtel Nat'l Inc.,* 24 Cal.4th 317, 350 (2000). Under this framework, courts presume that an employer's act of discharging an employee does not breach any contractual provision. *Foley*, 47 Cal.3d at 677.

Finally, even if Plaintiff could establish the existence of an implied contract not to terminate except for good cause, he was still terminated for good cause.  "Good cause" only means reasons that are "not trivial, arbitrary or capricious, unrelated to business needs or goals, or pretextual." *Cotran v. Rollins Hudig Hall Internal, Inc*., 17 Cal.4th 93, 108 (1998).  Here, Concialdi was terminated due to the restructuring of the Internal Audit department and Pagano needing to eliminate a position in order to add an auditor in Europe.

## R.    (P) The Breach of Contract Claims Survive.

Under *Guz,* when the "evidence logically permits conflicting inferences [of whether an implied contract exists], a question of fact is presented." *Id.* at 336.  Here, the evidence, including defendant's practice of firing employees for cause and Concialdi's nearly decade-long career with defendant, overwhelmingly supports all indicia of an implied agreement. *McLain v. Great Am. Ins. Cos.,* 208 Cal.App.3d

1476, 1481 (1989) (18 months' employment held sufficient). (P98; Pl. Depo., 162:7-13, 165:9-23, 167:5-13; JEX 37, p. 426, Concialdi Decl., ¶ 3; Pagano Depo., 94:15-21.)

**S.    (D) Plaintiff's Negligent Hiring, Supervision and Retention Claim Fails.**

"[I]n California, an employer can be held liable for negligent hiring if he knows the employee is unfit, or has reason to believe the employee is unfit or fails to use reasonable care to discover the employee's unfitness before hiring him." *Evan F. v. Hughson United Methodist Church* (1992) 8 Cal.App.4th 828, 843.  Liability can only be found if "the employer knew or should have known that hiring [or supervising] the employee created a particular risk or hazard and that particular harm materializes." *Doe v. Capital Cities* (1996) 50 Cal.App.4th 1038, 1054. "The cornerstone of a negligent hiring [or retention] theory is the risk that the employee will act in a certain way and the employee does act in that way." *Id*. at 1055

Here, there is no evidence to support Plaintiff's claims that Jacobs or anyone in its employ was in any way an aggressor or acted in a retaliatory or improper manner towards Plaintiff. More to the point, there is no evidence showing that Jacobs was negligent in hiring Pagano.  In fact, Plaintiff in fact admits that "Edd was your typical manager" and that he "got along with him." (UF D18 and D19; JEX 1, p. 14 (Pl. Depo. 38:8-11; 38:12-14).)

Plaintiff's negligence-based claims are also barred by the Workers' Compensation Act.  The law is clear that the workers' compensation system provides the sole and exclusive remedy of the employee against an employer for injuries sustained in the workplace, including claims for negligence. *See* Cal. Labor Code §§ 3600(a), 3601, 3602(a). Courts have reinforced this rule in connection with negligent supervision and retention claims. *See Coit Drapery Cleaners, Inc. v. Sequoia Insurance Co.*, 14 Cal.App.4th 1595, 1606 (1993) ("Any claim for mere negligence by [defendant] would be barred here by the workers' compensation laws, since [plaintiff] was the employee of [defendant] and may not sue it for its allegedly

negligent or improper supervision.")

**T.    (P) Concialdi's Negligent Hiring, Supervision, and Retention Claim Should Survive.**

Concialdi specifically testified that Jacobs engaged in wrongdoing by getting rid of Plante and hiring and retaining Pagano, who harassed him. (P90; Pl. Depo., 168:22-169:23.)  Even Concialdi's co-workers noticed Pagano's unfair treatment of Concialdi, and defendant knew or should have known of this treatment, as well. (P56; Pl. Depo., 149:7-10; JEX 37, pp. 429-430, Concialdi Decl., ¶ 15.)  Defendant cannot hope to hide behind the workers' compensation exclusivity rule. "The Legislature did not intend that an employer be allowed to raise the exclusivity rule for the purpose of deflecting a claim of discriminatory practices." *Accardi v. Sup. Ct.,* 17 Cal.App.4th 341, 352 (1993) (citations omitted).

**U.    (D) Plaintiff's IIED Claim Fails as a Matter of Law.**

To succeed on a claim of intentional infliction of emotional distress, plaintiff must demonstrate: (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) suffering of severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendants' outrageous conduct. *Christensen v. Superior Court*, 54 Cal.3d 868, 903, 2 Cal.Rptr.2d 79, 820 P.2d 181 (1991).

Concialdi cannot show that Jacobs engaged in such extreme and outrageous conduct that goes beyond all bounds of decency and would be intolerable in a civilized society.[11] *Alcorn v. Anbro Engineering, Inc*., 2 Cal.3d 493, 499, fn. 5 (1970); *Cervantez v. J.C. Penney Co*., 24 Cal.3d 579, 593 (1979).  Liability for intentional

---

[11] Plaintiff's claim for IIED also fails as a matter of law because any distress was caused from conduct normally occurring in the workplace and is precluded by the Workers' Compensation Act. *See* Lab. Code §§ 3200 *et seq*., 3600, 3602(a), 5300; *Cole v. Fair Oaks Fair Prot. Dist*., 43 Cal.3d 148, 159-160 (1987); *Livitsanos v. Super. Ct*., 2 Cal.4th 744, 754 (1992); *Shoemaker v. Myers*, 52 Cal.3d 1, 25 (1990); *Coit Drapery Cleaners, Inc. v. Sequoia Insurance Co*., 14 Cal.App.4th 1595 (1993).

inflection of emotional distress "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Hughes v. Pair*, 46 Cal.4th 1035, 1050 (2009) (citations omitted).

Here, Plaintiff admits that he "got along with Pagano," considered him to be a "typical manager," and that Pagano was not in any way rude or abrasive at the time he was informed he was being laid off. (UF D118; JEX 1, p. 60 (Pl. Depo. 176:9-12.) Other than the termination meeting, Concialdi's only other claim was that he received a "*little bit of stress*" from Pagano's questions about his walking. (UF D111; JEX 1, p. 60 (Pl. Depo.176:13-19).)

Furthermore, Concialdi admits that his alleged emotional distress stems from the act of being terminated itself and from being subsequently unemployed. (UF D119; JEX 1, p. 67 (Pl. Depo. 198:9-13).) However, personnel-related actions, such as criticism, firing and demotions, cannot support an IIED claim. *Janken v. GM Hughes Electronics*, 46 Cal.App.4th 55, 64-65 and 80 (1996).

## V.    (P) There Is a Disputed Issue as to Whether Defendants Engaged in Extreme or Outrageous Conduct.

Concialdi's claims for retaliation, harassment, discrimination, and wrongful employment termination all support his claim for intentional infliction of emotional distress, as an "employer's decision to discharge an employee [that] results from an animus that violates the fundamental policy" is "misconduct [that] cannot be considered a normal part of the employment relationship." *Cabesuela v. Browning-Ferris Industries of California, Inc.,* 68 Cal.App.4th 101, 112 (1998). Every time Pagano made a remark about Concialdi's age and the way he walked, it was a reminder to Concialdi that he had MS and was unable to walk normally since his relapse. (P106; Pl. Depo., 176:13-19; JEX 37, p. 430, Concialdi Decl., ¶¶ 16-17.) As a result, plaintiff's IIED claim must also survive.

## W.    (D) Plaintiff's Claim For Punitive Damages Fails As A Matter Of Law

California law provides for corporate liability where "the advance knowledge,

ratification, or act of oppression, fraud, or malice (is) ... on the part of an officer, director, or managing agent of the corporation." Civ. Code §3294(b).  A manager who can hire or fire employees, but does not have ***substantial authority over decisions that ultimately determine corporate policy***, is not a managing agent for the purpose of the imposition of punitive damages liability. *White v. Ultramar, Inc.*, 21 Cal.4th 563, 575 (1999).

Plaintiff cannot establish that Pagano had authority to determine corporate policy. In fact, Pagano only updated some internal audit policies which only applied to the Internal Audit group (UF D120; JEX 2, pp. 125 (Pagano Depo. 101:1-21)), and which took place over a team meeting where everyone in internal audit contributed to the update: "It was a team effort," (UF D121; *Id.* at p. 124-27 (Pagano Depo. 100:19-103:11).)   In fact, Concialdi contributed to making the revisions to the same documents that Pagano did. (UF D122; *Id.* at p. 127-28 (Pagano Depo. 103:19-104:20).)  Outside of this update to internal audit policies, Pagano did not work on any other policies at Jacobs. (UF D123; JEX 2, p. 128, (Pagano Depo. 104:17-20).)

This is not proof of substantial authority over corporate decision making at the time of Concialdi's termination.  Pagano also does not have any authority to make decisions on corporate policy. (UF D124; JEX 3, p. 155 (Pagano Decl. ¶ 36[12]).) Furthermore, even if Pagano could be considered a managing agent, Plaintiff cannot show any evidence of malice, fraud, or oppression on the part of Pagano.

## X.    (P) Punitive Damages Must Survive.

For corporate punitive damages liability, section 3294(b) requires that the wrongful act giving rise to the exemplary damages be committed by an "officer, director, or managing agent." *White v. Ultramar, Inc.,* 21 Cal.4th 563, 572 (1999). Importantly, "malice does not require actual intent to harm." *Angie M. v. Sup. Ct.,* 37

---

[12] Plaintiff Evidentiary Objection: Pagano Decl., ¶ 36: "I have never been a managing agent of Jacobs and do not attend board meetings." Grounds for objection: The statement is vague and ambiguous, and the use of the term "managing agent" is conclusory and lacks foundation.

Cal.App.4th 1217, 1228 (1995).  Even "[un]intentional conduct comes within the definition of malicious acts punishable by the assessment of punitive damages when a party intentionally performs an act from which he knows, or should know, it is highly probable that harm will result." *Ford Motor Co. v. Homes Ins. Co.,* 116 Cal.App.3d 374, 381 (1981); *Angie M.* at 1228. Berryman, the executive vice president and CFO, participated in the employment termination decision and qualifies as an officer, director, or managing agent.  Berryman was the individual who told Pagano to eliminate a position from his department. (P76; Pagano, 237:16-238:10.) As defendant concedes, Pagano also had substantial authority over decisions on corporate policy and governed and wrote the policies for the internal audit department. (P77; Pagano Depo., 101:1-21.)

## IV.    <u>PLAINTIFF'S ADDITIONAL EVIDENTIARY OBJECTIONS</u> [13]

Pagano Decl., ¶ 38: "I never made any decisions concerning Concialdi with regard to any disability or any other protected category/activity."  Grounds for Objection: Pagano makes a conclusory statement surround legal terms that he as a lay person does not have a proper understanding of (i.e. "protected category/activity.")

Berryman Decl., ¶ 7: "I did not participate in any way in the selection of the internal auditor that was chosen for layoff." Grounds for Objection: The phrase "I did not participate in any way" is vague and ambiguous, conclusory, and lacks foundation.

## V.    <u>JOINT CONCLUSION</u>

Defendant requests summary judgment be granted in its entirety and plaintiff requests that summary judgment be denied in its entirety.[14]

---

[13] Defendant reserves the right to object to and address the evidence that Plaintiff has offered in its portion of the joint brief when Defendant files its supplemental memorandum.

[14] Summary judgment shall also be deemed to include partial summary judgment here.

1
2

DATED: December 19, 2017

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

3
4
5
6

By: /s/ Thomas B. Song
  Vince M. Verde
  Thomas B. Song

7

Attorneys for Defendant
JACOBS ENGINEERING GROUP INC.

8
9

DATED: December 19, 2017

SHEGERIAN & ASSOCIATES, INC.

10
11

By: /s/ Carney R. Shegerian
Carney Shegerian
Mahru Madjidi

12
13

Attorney for Plaintiff
MARK J. CONCIALDI

14
15

32323175.2

16
17
18
19
20
21
22
23
24
25
26
27
28

51